BENJAMIN LEVINSON AND FLORENCE LEVINSON, ET AL.,[1] PETITIONERS,
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1962–64, 2106–64, 2107–64. Filed January 20, 1966.

*Sam L. Levinson*, for the petitioners in docket No. 1962–64.
*Joseph J. Lanza*, for the petitioners in docket Nos. 2106–64 and 2107–64.
*Walter John Howard, Jr.*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings respondent determined deficiencies in petitioners' income taxes as follows:

| Docket No. | Petitioners | Taxable year | Deficiencies |
|---|---|---|---|
| 1962-64 | Benjamin Levinson and Florence Levinson | 1960<br>1961<br>1962 | $1,832.57<br>3,071.37<br>2,600.35 |
| 2106-64 | Edwin L. Howard and Elizabeth R. Howard | 1961<br>1962 | 1,571.90<br>2,314.81 |
| 2107-64 | Clyde V. MacDonald and Joan D. MacDonald | 1961<br>1962 | 3,628.59<br>6,112.19 |

The only issue remaining for decision is whether $142,000 of the $147,000 sales price of a business sold by Benjamin Levinson (referred to herein as Levinson) to Edwin L. Howard (referred to herein as Howard) and Clyde V. MacDonald (referred to herein as MacDonald) in 1960 was paid for a covenant not to compete, as recited in the written agreement of sale, or was paid for goodwill of an established business, as contended by the seller. The selling price was to be paid $5,000 down at the time of closing and $1,000 per month over a period of about 12 years. Levinson reported the amounts he received in the years before us as capital gain while Howard and MacDonald claimed the $1,000 monthly payments as deductions against ordinary income as payments for a covenant not to compete. Respondent, in order to protect the revenue, determined that the monthly payments were taxable as ordinary income to the seller, Levinson, and also that they were not deductible by the buyers, Howard and MacDonald, but stands neutral on the controversy here,

[1] Proceedings of the following petitioners are consolidated herewith: Edwin L. Howard and Elizabeth R. Howard, docket No. 2106–64, and Clyde V. MacDonald and Joan D. MacDonald, docket No. 2107–64.

recognizing that if we find that the payments were for a covenant not to compete they are deductible by the buyers and taxable as ordinary income to the seller, or if we find that the payments were for goodwill they are not deductible by the buyers but are taxable as capital gain to the seller.

All other issues raised by the pleadings have been conceded by petitioners.

### FINDINGS OF FACT

Some of the facts were stipulated and are so found. The stipulations of facts are incorporated herein by reference.

Benjamin Levinson and Florence Levinson are husband and wife residing at 18 Vidal Drive, San Francisco, Calif. They filed a joint income tax return for the taxable year 1960 with the district director of internal revenue, Tacoma, Wash., and filed joint income tax returns for the taxable years 1961 and 1962 with the district director of internal revenue, San Francisco, Calif.

Edwin L. Howard and Elizabeth R. Howard are husband and wife residing at 4211 83d Street SE., Mercer Island, Wash. They filed joint income tax returns for the taxable years 1961 and 1962 with the district director of internal revenue, Tacoma, Wash.

Clyde V. MacDonald and Joan D. MacDonald are husband and wife residing at 12704 72d Street NE., Kirkland, Wash. They filed joint income tax returns for the taxable years 1961 and 1962 with the district director of internal revenue, Tacoma, Wash.

Prior to 1949 Levinson had been president of Puget Supply Co., Distribution Division of Burke Millwork, and also a vice president of Burke Millwork, and had previously been manager of the Glass, Sash, and Door Department of W. P. Fuller Co. In 1949 Levinson started his own business, a sole proprietorship known as Benj. Levinson & Co. (hereafter referred to as the company). The company was established by Levinson to engage in the business of selling doors and millwork throughout the country, with headquarters in Seattle, Wash. Levinson and his salesmen sold plywood, lumber, and lumber products for the accounts of manufacturers, who paid the company a commission on all sales made for them. The company's salesmen were located in various cities throughout the Nation and sold the various manufacturers' products to firms which required the material produced by the factories. The business engaged in is what is commonly known as that of a manufacturer's representative and was primarily a sales and service business. As such it had no inventories and few tangible assets.

Some of the salesmen employed by the company were paid a fixed monthly salary plus a bonus payable at Levinson's sole discretion.

Others were paid on a straight commission basis. In January 1960 the company employed five salaried salesmen and nine salesmen or sales outlets working on a commission basis. Sales outlets for the company usually worked under a letter agreement, under which the selling outlet agreed not to sell or represent any line or product similar or conflicting to those lines which it would sell for the company in the territory assigned to it, and under which it was also provided that should the sales agreement be terminated, the selling outlet would not represent any principals whom the company was currently representing for specified periods of time ranging from 1 year to 5 years.

The company represented many different manufacturers for varying lengths of time over the years, usually under exclusive or nearly exclusive sales agreements. The income tax returns of Levinson reported gross receipts (mostly commissions) and net profits of the company as follows:

| Year | Gross receipts | Net profit |
|------|----------------|------------|
| 1949 | $33,267.59 | $13,016.72 |
| 1950 | 111,776.76 | 58,841.14 |
| 1951 | 186,228.40 | 70,837.60 |
| 1952 | 98,518.47 | 28,657.42 |
| 1953 | 142,876.80 | 56,576.65 |
| 1954 | 193,835.07 | 64,554.19 |
| 1955 | 200,939.14 | 60,894.10 |
| 1956 | 222,623.12 | 44,257.23 |
| 1957 | 173,607.52 | 35,629.69 |
| 1958 | 180,306.16 | 30,220.73 |
| 1959 | 232,072.04 | 36,172.15 |
| 1960 | 110,920.89 | 19,123.81 |

Howard was the first salesman employed by Levinson in 1949 and he continued to work for the company until the company was sold in 1960. Howard was employed under a contract which provided for a fixed salary and a bonus payable in the discretion of Levinson. Howard was thoroughly familiar with the building material business and had experience as a salesman in such business and allied lines. Howard's employment contract was terminable by either party on 30 days' notice and in the event of termination Howard agreed that for a period of 5 years following such termination he would not solicit, sell for, or do business with, except with the written permission of Levinson, any of the manufacturers whom Levinson represented as a manufacturer's agent during the term of Howard's employment in any territory covered or serviced by Levinson.

In 1956 Levinson developed a stomach ulcer and was advised by his physician that he should get away from the active management of the business. On or about July 1, 1956, Levinson and his wife moved from Seattle, Wash., to San Francisco, Calif. They sold their home in Seattle and have lived in San Francisco ever since. When

Levinson left Seattle Howard took over as local manager of the business. However, Levinson received daily reports on the business operations at his home in San Francisco. He was in contact with Howard by telephone daily or at least every 2 or 3 days, he signed practically all of the company checks, and he went to Seattle for business purposes once or twice a week at the beginning, tapering off to once a week or less occasionally during the later years. Levinson also did some entertaining of customers of the company in San Francisco and elsewhere. Levinson suffered a recurrence of his ulcer trouble in 1958 and again had to become less active in the business for a period of time.

The principals for whom the company was selling changed considerably over the years. By early 1960 and prior thereto the company had become the main sales outlet for Seattle Door Co., Inc. (hereafter referred to as Sedorco), Kirkland, Wash., of which MacDonald was the president and major stockholder. By early 1960 approximately 70 percent of the sales of the company were for the account of Sedorco. At that time the company was also selling most of the products, possibly as high as 90 percent, of the total sales of products of Sedorco. The principal products sold for Sedorco were flush doors. One of the other manufacturers for whom the company did considerable business was E. A. Nord Sales Co., Everett, Wash., which manufactured and sold stile doors.

As of the first of the year 1960 the company was representing Sedorco under a verbal understanding between Levinson and MacDonald confirmed by various letters from Levinson to MacDonald, under which the company was appointed exclusive sales representative for Sedorco's flush door production, covering all sales to accounts in most of the Western States, except for specific accounts set forth in the letters, for a specified commission, which agreement by its terms could be terminated by either party by giving from 60 days' to 6 months' notice. By letter dated January 22, 1960, Levinson confirmed a modification of the prior agreements, by which it was provided that Levinson would be the exclusive sales agent for Sedorco flush doors, with one exception, and that the termination clause was modified to provide that either party could terminate the agreement on 4 months' notice. Ninety days after notice of termination was given, either party could enter into relationships with other parties to render similar services but no actual sales to or for others could be made until the expiration of the 4 months.

At some time not long prior to the negotiations hereinafter related, Howard became concerned about the fact that Levinson's son would soon be graduating from college and might move into the business. At that time Levinson offered to sell a 45- or 49-percent interest in the business to Howard for $20,000 upon any terms convenient to Howard.

Howard did not accept the offer because it was for less than a 50-percent interest.

Early in 1960 MacDonald informed Levinson that he would like to have more to do with the sales of Sedorco's products and that he would like to buy an interest in Levinson's company. At the same time Howard also expressed an interest in buying into Levinson's business. Extended negotiations between the parties toward this end started soon thereafter.

It was first proposed that a corporation be formed to take over the business of the company with Levinson, MacDonald, and Howard as equal owners thereof. An agreement was prepared which was dated March 29, 1960, and executed by each of the three parties. The agreement provided that Levinson would convey to the new corporation all of the physical assets of the company, excluding accounts receivable, commissions due, and cash on hand, using the book value of those assets on the company's books as the agreed value, and that stock would be issued to each of the three parties in the amount of the book value, MacDonald and Howard to pay Levinson their proportionate share of said book value in payment for their stock. The agreement further provided that the new corporation should be the exclusive sales agent for all products manufactured and sold by Sedorco and its associated companies. The profits of the business of the corporation were to be shared equally, except that Howard should receive out of the profits the first $12,000 annually, MacDonald and Levinson were to receive $12,000 each out of the next $24,000 in profits, and all profits above $36,000 per annum were to be shared equally by the stockholders. At any time after 5 years from the date of the agreement MacDonald was to have the right to sell his stock of the new corporation to Levinson at the book value of its assets, excluding goodwill, and upon such sale and purchase MacDonald should have the right to cancel the exclusive sales agreement between Sedorco and the corporation and should have the right to employ any of the corporation's employees irrespective of any restrictive covenants contained in contracts the corporation might have with its employees. Articles of incorporation for the new corporation were drafted and signed by all three parties on May 4, 1960, and were ready to be filed with the secretary of state on May 11, 1960. However, a supplemental agreement dated May 12, 1960, was prepared which modified the original agreement of March 29 to permit Northwest Door & Plywood Sales Co. to sell products of Sedorco but during such period Levinson and Howard would both precede MacDonald in taking $12,000 each out of the profits of the business. Before this document could be signed by all parties MacDonald and Levinson had a disagreement and the supplemental agreement was never signed by all parties. The articles of

incorporation were not filed in the secretary of state's office and the corporation was never formed.

Negotiations were thereupon discontinued between the parties for a period of several weeks, after which MacDonald and Howard offered to buy Levinson's business from him. This was agreeable to Levinson and negotiations were resumed between the parties and their attorneys. Levinson was in San Francisco during most of this time and Howard acted as a go-between in the negotiations between MacDonald and Levinson. It was Howard's original understanding that Levinson was willing to sell the business for $100,000, payable $5,000 down and $1,000 per month for 8 years.

After discussing the matter with Howard, the attorneys for Howard and MacDonald drafted a sales agreement wherein it was provided that Levinson would sell the business to MacDonald and Howard for $100,000, of which $2,500 was said to be attributable to the physical assets, $2,500 was attributable to the intangible assets of the company, and $95,000 was attributable to restrictive covenants thereinafter set out. $5,000 was to be paid to the seller at the time of the closing and the balance of the purchase price was to be paid to the seller in monthly installments of $1,000 in payment for the restrictive covenants. This draft of the sales agreement was not executed by the parties. Negotiations continued and additional drafts of the sales agreement were prepared, the provisions of which were substantially the same as in the original draft, except that the purchase price was increased to $147,000 and modifications were made in the restrictive covenant provisions.

A final agreement of sale was eventually agreed upon and was executed by all three parties under date of June 14, 1960. This agreement provided that Levinson would sell to MacDonald and Howard the business owned by Levinson, including the optional right to use the trade name "Benj. Levinson & Co." for a period of 6 months, all furniture, fixtures, supplies, and equipment used in the business, all customers lists, files, records, and all contracts between the company and its customers and salesmen or distributors, but not including any automobiles or cash or the books of account of the company. The purchase price for all of the above assets was $147,000, of which $2,500 was stated to be attributable to the physical assets, $2,500 was attributable to the intangible assets of the company, and $142,000 was attributable to the restrictive covenants referred to in paragraph 8. $5,000 of the purchase price was to be paid at the time of closing for the physical assets and intangible assets of the company, and the balance of $142,000 was to be paid in monthly installments of $1,000, without interest, beginning 30 days after closing, in payment for the restrictive covenants referred to in paragraph 8. In the event of the death of

the seller, any balance due was to be paid to Levinson's estate in the same monthly installments. It was specifically provided that the agreement sets forth the entire understanding of the parties and it shall not be changed or terminated orally.

Paragraph 8 of the sales agreement provided, in substance, that for a period of 12 years from the date of closing the seller shall not:

(a) Solicit or accept any business from any manufacturers whom the company had represented as agent, per the list attached thereto as Exhibit A;

(b) Request or advise any clients of the company to withdraw, curtail, or cancel his business with the company;

(c) Induce or influence any employee, salesman, distributor, or broker of the company to terminate his relationship;

(d) Engage in business as a manufacturer's representative of companies manufacturing or distributing flush doors, stile and rail doors, and other specified wood products, in the State of Washington, either as an employee, proprietor, partner, or stockholder.

The principal differences between the restrictive covenant provisions contained in the final agreement of sale and the first draft thereof were the extension of the period of time from 8 years to 12 years and the attachment of Exhibit A listing the specific manufacturers with whom Levinson should not do business as provided in subparagraph (a) above.

Prior to the drafting of the final sales agreement, correspondence and conversations had taken place between the attorneys representing MacDonald and Howard and the attorneys representing Levinson. By letter dated June 6, 1960, attorneys representing MacDonald and Howard wrote to Levinson's attorney, enclosing a final draft of the sales agreement, in which they recited that the agreement had been accepted by Levinson with the exception of the monthly payments for the restrictive covenants, and pursuant to Levinson's request these monthly payments had been extended, so that they would continue for a period of 12 years. This letter also stated, "This purchase is feasible only because the monthly payment of Mr. Levinson will be treated as ordinary business deductions. Also, it was understood that complete freedom from competition was the expected exchange. In addition, any deviation from the instrument, as drafted, might weaken the tax position which would result in a very uneconomical situation for the Purchaser." Reference was also made in this letter to the request of Levinson that the restrictive covenants be modified so that the purchasers would forbear their right to seek monetary relief in case of a breach of the covenant by Levinson. By letter dated June 14, 1960, from Howard and MacDonald to Levinson, delivered at the same time the sales agreement was signed, the writers referred to the restrictive covenants set forth in the agreement and Levinson's request that he

be given a letter recognizing that there might be a possibility at some future date that he might request permission to do business as a manufacturer's representative with some of the manufacturers referred to in the sales agreement. The letter stated that if such request met with the approval of the writers, written permission would be granted, but that it was understood that the writers were under no obligation whatsoever to grant such request or to relieve Levinson of the restrictive covenants of the sales agreement.

Shortly after the purchase of the business by MacDonald and Howard the name of the company was changed from Benj. Levinson & Co. to Howard Sales Associates. Howard Sales Associates, Inc., was incorporated on June 15, 1960, with 75 shares of its authorized capital stock being issued to each of MacDonald and Howard, and the business formerly conducted by the company was thereafter conducted by this corporation. This corporation filed Small Business Corporation Return of Income for the fiscal years ended May 31, 1961 and 1962, on which it claimed deductions of $11,350 and $11,844, respectively, as amortization of a noncompetitive agreement acquired June 15, 1960, for a total cost of $142,000, with a life of 12 years. On their respective individual joint returns for the calendar years 1961 and 1962, MacDonald and Howard reported their share of the income of Howard Sales Associates, Inc., a subchapter S corporation. The Small Business Corporation Return of Income form filed by Howard Sales Associates, Inc., for its fiscal year ending May 31, 1961, reported gross receipts of approximately $125,500 and taxable income of $443.06, and its return for the fiscal year ended May 31, 1962, reported gross receipts of approximately $176,300 and taxable income of approximately $32,000.

During the year 1960, Levinson received a total of $11,000 from MacDonald and Howard on the sale of the business, $5,000 being the downpayment and $6,000 in 6 monthly installments, most of which he reported on his tax return for 1960 as long-term capital gain.[2] During the years 1961 and 1962, Levinson received $12,000, in monthly installments of $1,000, from MacDonald and Howard on the sale of the business, most of which he reported on his tax returns for those years as long-term capital gain.[2]

ULTIMATE FINDING

The payments of $1,000 per month paid to Levinson by MacDonald and Howard during the years here involved were payments for a covenant not to compete.

---

[2] The returns filed for these 3 years indicate that the ratio of profit from the sale of the business was 99.43 percent, resulting in a taxable gain of $10,937.30 for 1960 and a taxable gain of $11,931.60 for each of the years 1961 and 1962, which was the amount reported as long-term capital gain.

388

The issue for decision is whether the payments of $1,000 per month paid by MacDonald and Howard to Levinson during the period here involved on the purchase price of Levinson's business were for a covenant not to compete, as claimed by the buyers, or for goodwill or other intangible assets of the business, as claimed by the seller. Our ultimate finding above is dispositive of the issue.

The sale of the business, a sole proprietorship commission agency which represented manufacturers of wood products, principally doors, throughout the Nation, was negotiated by the parties and their attorneys over a considerable period of time. The final written agreement of sale provided for a total purchase price of $147,000, payable $5,000 down and $1,000 a month for approximately 12 years. The purchase price was specifically allocated in the agreement, being $2,500 for the physical assets consisting principally of office furniture and equipment; $2,500 for the intangible assets; and $142,000 for the covenant not to compete. The evidence shows that Levinson, the seller, determined the selling price and was primarily interested in receiving $1,000 per month for a period of about 12 years, at which time he would be a little older than 65 years of age; and that MacDonald and Howard, the purchasers, or their representatives, insisted on allocating the monthly payments to the restrictive covenants. While Levinson testified that he did not negotiate concerning the allocation of the monthly payments to the covenant not to compete, he acknowledges that he was aware of the allocation and of the buyers' insistence thereon, and was also advised of the tax consequences thereof. However, he felt that the allocation was so unrealistic that it meant nothing and that the entire purchase price was actually paid for the business, principally its customers lists and goodwill. Levinson argues that he was not well, had not been actively engaged in the business for several years, and had no intention of competing in business with the buyers.

On the other hand, MacDonald and Howard contend that the business was a personal service business which had no goodwill in excess of the $2,500 allocated to intangible assets in the agreement, that the physical assets of the business were realistically valued at $2,500 in the agreement, that Howard and MacDonald were well aware of who Levinson's customers were or could easily compile their own mailing list, that Levinson's contracts with his salesmen were unenforceable and of little value, that the principal reason they were willing to meet Levinson's price was for the assurance of freedom of competition from Levinson, who was a dynamic salesman and knew the business and the people involved in it intimately, and that they would not have even considered paying the $142,000 except for the covenant not to compete.

While we believe that a somewhat more realistic allocation of the purchase price might have been made, and recognize that the purchasers were acutely aware of the tax advantages of the allocation made in the agreement, nevertheless, we are convinced that the agreement was made freely, willingly, and knowingly between two parties dealing at arm's length and we are not inclined to reform their agreement for them, which it seems unlikely Levinson could unilaterally do on his own behalf, see *Rogers* v. *United States*, 290 F. 2d 501, for tax purposes. Even if we were so inclined we have very little evidence upon which we could base a different allocation of the purchase price, except entirely to goodwill, and we are convinced that it should not all be allocated to goodwill of the business. Furthermore, neither party asks us to make such an allocation or suggests a basis on which it should be done.

The nub of the question is whether the covenant not to compete was actually dealt with as a separate item in the transaction and, if it was, how much was paid for it. *Gazette Telegraph Co.*, 19 T.C. 692, affd. 209 F. 2d 926; *Howard Construction, Inc.*, 43 T.C. 343. While neither the Commissioner nor the courts are bound by the form in which the parties clothe the transaction, *Carl L. Danielson*, 44 T.C. 549, on appeal (C.A. 3, Dec. 21, 1965); *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761, affirming 19 T.C. 718, where the dispute is between the parties to the agreement themselves, and it is apparent that the provision for the covenant not to compete was agreed upon by both parties with a full understanding of the implications thereof, the courts are reluctant to go beyond the terms of the agreement. *Hamlin's Trust* v. *Commissioner, supra; Rogers* v. *United States, supra; Schulz* v. *Commissioner*, 294 F. 2d 52, affirming 34 T.C. 235. As said in *Ullman* v. *Commissioner*, 264 F. 2d 305, affirming 29 T.C. 129:

when the parties to a transaction such as this one have specifically set out the convenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money.

If a convenant not to compete is separable from the other assets bargained for and the parties have realistically and in good faith treated it in a separate and distinct manner so that a severable consideration for it can be shown, and it has some basis in fact or arguable relationship with business reality so that reasonable men might bargain for such an agreement, the purchaser is entitled to amortize the price paid for the covenant ratably over the life of the covenant. *United Finance & Thrift Corporation of Tulsa*, 31 T.C. 278, affd. 282

F. 2d 919, certiorari denied 366 U.S. 902; *Schulz* v. *Commissioner*, *supra; Carl L. Danielson, supra; Howard Construction, Inc., supra.* We believe the covenant involved in this case meets the above test, despite the fact that most of the purchase price was allocated to the covenant.

There is no doubt here that the purchasers were vitally concerned with the covenant not to compete from the beginning of the negotiations, and that they had every right to be so. Levinson was a dynamic salesman and had built the business up himself and knew most of the customers for the products personally. While he may not have been able to take the Sedorco business, which represented about 70 percent of the company business, with him, there was no reason to think that he could not have sold the Sedorco customers a different but competing line, without the covenant not to compete, and this would have meant double trouble for MacDonald, who would not only have lost the market for Sedorco's products, but would have lost the sales commission as well. And while Levinson may not have been in the best of health and may not have had any immediate intention of going into competition with the purchasers, he had demonstrated that he was capable of operating the business from long distance despite his health, and it is also apparent from his request for possible permission to go back into business at a later date, that he had not entirely given up all thoughts of going back into the business.

Levinson contends that the covenant not to compete was never actually negotiated; that neither of the purchasers ever actually discussed a price to be put on the covenant with him. The answer to this is that he apparently never objected to the price attributed to the covenant by the purchasers—so there was little reason for them to negotiate it. As said in *Hamlin's Trust* v. *Commissioner, supra*—

the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if the parties understand the contract and understandingly enter into it. * * *

Levinson admits that the matter of the covenant was brought to his attention and the tax consequences thereof were explained to him when the first draft of the agreement was presented to him, and that the amount allocated to the covenant was changed each time the total purchase price was changed. It can hardly be said here, as was said in *Rogers* v. *United States, supra*, that the seller had probably been maneuvered by the purchasers into a big tax disadvantage, because here, Levinson admittedly knew the tax consequences of the agreement as written. This, of course, distinguishes this case from such cases as *Schulz* v. *Commissioner, supra*, and *Howard Construction, Inc., supra*, and permits a different result than reached in those cases.

It is apparent from the evidence that Levinson was primarily interested in getting $1,000 per month as long as he could get it. Appar-

ently the only negotiations revolved about the length of time these payments would continue. There were no negotiations about the values assigned to the physical assets and the intangible assets of the business. It is reasonable to believe that when Levinson insisted that the payments be continued for 12 years rather than 8 years, the purchasers insisted that the term of the restrictive covenants be extended accordingly and that the increase in purchase price occasioned thereby be allocated to the restrictive covenants. Levinson urges that the fact that the payments were to continue for the full period even if he died within a year indicates that the payments were not realistically for a covenant not to compete. This same argument was made and rejected in *Eitingon-Schild Co. and Subsidiaries*, 21 B.T.A. 1163, wherein it was said:

The provisions of the contract relating to the payment to other persons of any remaining installments in the event of Ahern's death prior to 1933, we think, are immaterial. * * *

A value of $142,000 was put on the restrictive covenants by the purchasers and was agreed to by Levinson; Levinson determined the time over which the purchase price for that asset should be paid.

Levinson also argues that the large percentage of the total purchase price allocated to the restrictive covenants proves that it was unrealistic and done only for the tax advantage to the purchasers. While this concerns us, and would be of even greater concern if this were a fight between the Commissioner and the purchasers alone, we do not think it is of sufficient weight under the circumstances here to overcome the declaration of the parties in the sales agreement. See *Ullman* v. *Commissioner*, *supra*. We are convinced from the evidence that the purchasers would not have paid $147,000 for the business unless the largest part thereof was allocated to the restrictive covenants, where the attendant tax advantage would soften the blow. But whether their willingness to pay $142,000 for the covenant was motivated primarily by the tax advantage or by the value they placed on freedom of competition from Levinson, we are not prepared to say. It was probably motivated in part by both considerations. But as between the two groups of taxpayers here, where they have agreed upon the allocation, one of them is not at liberty to say that such was not the substance and reality of the transaction. *Hamlin's Trust* v. *Commissioner*, *supra*.

As an addendum we are inclined to refer to the language used by Judge Opper of this Court in his opinion in *Richard Ullman*, 29 T.C. 129, 139:

In addition, even where a proprietorship is sold, the existence of a distinct and severable contract separately engendered and bargained for, with a consideration divisible from that relating to the sale of the business, may so nearly constitute a payment for personal services as to be the purchase of a separate asset and

correspondingly to give rise to ordinary income wholly divided from the capital gain growing out of the sale of the business. * * *

We hold that petitioners MacDonald and Howard are entitled to deduct the $1,000 monthly payments here involved, and that they are taxable as ordinary income to petitioner Levinson.

*Decision will be entered for the respondent in docket No. 1962-64.*

*Decisions will be entered under Rule 50 in docket Nos. 2106-64 and 2107-64.*