Federal Oil Company v. Commissioner.
Federal Oil Co. v. Commissioner
Docket No. 5466-64.
United States Tax Court
T.C. Memo 1966-195; 1966 Tax Ct. Memo LEXIS 91; 25 T.C.M. (CCH) 996; T.C.M. (RIA) 66195; August 31, 1966
*91 Held: Certain payments made to petitioner by Sinclair Refining Company in the taxable years involved pursuant to an agreement for the sale of a retail fuel oil business were payments made in consideration of a covenant not to compete and not for the sale of goodwill. Martin D. Cohen, 744 Broad St., Newark, N. J., for the petitioner. Donald H. Cuozzo and William M. Gross, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income taxes of petitioner for the years 1960, 1961, and 1962 in the amounts of $16,739.74, $16,740, and $17,897.97, respectively. The sole issue is whether payments in the amount of $62,000 made to petitioner by Sinclair Refining Company in each of the years 1960, 1961, and 1962 were in consideration *92 of a covenant not to compete or for the sale of goodwill. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioner is a New Jersey corporation organized on June 18, 1937, as Federal Petroleum Corporation, with its principal office at 525 Raymond Boulevard, Newark, New Jersey. It maintains its books and records on a calendar year and accrual basis, and filed its Federal income tax returns for 1960, 1961, and 1962 with the district director of internal revenue at Newark, New Jersey. Petitioner at all times has been a wholesale distributor of gasoline and other petroleum products, selling to service stations located in Essex County, New Jersey, under a distributorship contract with American Oil Company. In addition to its wholesale distributor business, petitioner had approximately 80 retail fuel oil customers in November 1952. Federal Economy Corporation (hereinafter referred to as Federal) and Economy Service, Inc. (hereinafter referred to as Economy), were New Jersey corporations organized on January 1, 1957, and January 5, 1956, respectively, with principal offices in Newark, *93 New Jersey, at 525 and 523 Raymond Boulevard, respectively. Petitioner owned 100 percent of the stock of each corporation from the date of its incorporation until its dissolution on June 30, 1959. While in existence, Economy was a retail dealer in fuel oil which sold and serviced oil burners, and Federal was engaged in the business of delivering fuel oil to Economy's customers. At all material times, petitioner, Economy and Federal each filed separate Federal income tax returns and not consolidated returns. Michael and Sydel Singer are husband and wife who reside in New York, New York. In 1958 Michael owned 66 2/3 percent of the outstanding stock of petitioner. At all times material herein, he was president of petitioner and was president of both Economy and Federal during their corporate existence. Sydel was a substantial stockholder in petitioner and was assistant vice president of petitioner, Economy, and Federal but was not active in the management of the retail fuel oil business. In November 1952 petitioner, then still known as Federal Petroleum Corporation, purchased all of the outstanding stock of an unrelated New Jersey corporation known as Federal Oil Company of Union, *94 New Jersey (hereinafter referred to as Old Federal). At the time of the stock purchase, Old Federal had approximately 1,525 retail fuel oil customers and was engaged in the business of selling retail fuel oil to customers consisting of private homes, industrial plants and apartment houses, as well as oil burner sales and service. The average gallonage of fuel oil sold by Old Federal to retail customers was approximately three million gallons annually. The total purchase price for this acquisition by petitioner was $118,652.43. From November 1952 until December 31, 1953, Old Federal was operated as a wholly-owned subsidiary of petitioner. On January 1, 1954, Old Federal was merged into petitioner, which thereupon changed its name to Federal Oil Company, by which name it has been known at all times since. Upon examination of petitioner's Federal income tax returns for the taxable years 1953 and 1954, respondent determined that petitioner had not correctly allocated its cost of acquiring Old Federal to the various assets acquired through the purchase. A deficiency notice was issued to petitioner for the taxable year 1953 and petitioner thereafter filed a petition with this Court for *95 redetermination of the deficiency. The case was ultimately settled by stipulation of the parties and pursuant to the settlement petitioner was required to allocate, and did in fact allocate, on its books of account the sum of $88,004.17 to the cost of acquiring the goodwill of Old Federal. On December 7, 1953, petitioner acquired all of the retail fuel oil and oil burner service and sales customers of City Coal and Fuel Oil Co., Inc., of Newark, New Jersey, a New Jersey corporation (hereinafter referred to as City Coal). Prior to such acquisition, the annual volume of retail fuel oil sales made by City Coal was approximately two million gallons. The only other asset which petitioner acquired from City Coal, apart from its retail account, was an oil truck. In connection with the settlement of petitioner's Federal income tax liabilities for 1953 and 1954, petitioner was required to allocate and did allocate on its books for 1953 and 1954 the amounts of $10,044.33 and $16,383.52, respectively, as the cost of acquiring the goodwill of City Coal. In December 1955, petitioner contracted with Emil and Rita Miller to purchase all of the stock of Economy Service, Inc. (hereinafter referred *96 to as Old Economy), a corporation engaged in the retail fuel oil and oil burner service and sales business, and the physical assets, also owned by the Millers, used by Old Economy in the conduct of its business, consisting of land and buildings located at 515-527 (rear) and 515-525 (front) Raymond Boulevard in Newark, New Jersey, and certain oil storage tanks and other related facilities. The purchase price was $250,000 for the stock and $600,000 for the physical assets. Petitioner acquired these assets in January 1956, which were placed on its books as follows: Land
$251,000
Garage building (office)
62,500
Factory building and garage
137,500
Tanks, dock, pump-house and yard
equipment
149,000
Total
$600,000 Simultaneously with the acquisition of the stock, petitioner caused Old Economy to be liquidated and dissolved. Petitioner momentarily held the assets of Old Economy until it organized Economy on January 5, 1956, and acquired all of its stock in exchange for the transfers to Economy of these assets along with all of its other retail fuel oil and oil burner service and sales business, including all of its retail customers. All of the retail fuel oil and *97 oil burner installation and service business previously conducted by petitioner was handled by Economy after January 5, 1956. Petitioner did not directly engage in the retail fuel oil business after the formation of Economy during the period from January 5, 1956, through February 27, 1959. During the fiscal year May 1, 1957, to April 30, 1958, Economy made retail fuel oil sales of approximately 12 million gallons. Journal entries on Economy's books under date of December 31, 1958, reflect a liability owing by Economy to petitioner in the amounts of $88,004.17 and $10,044.33, respectively representing petitioner's cost in acquiring the goodwill of Old Federal and City Coal. A journal entry of March 31, 1959, reflects an additional liability for the cost of the goodwill of City Coal in the amount of $16,383.52. Petitioner's books of account contain corresponding journal entries. In approximately October 1958, Singer entered into negotiations on behalf of petitioner, Economy and Federal, with the Sinclair Refining Company (hereinafter referred to as Sinclair), a Maine corporation, with respect to the sale of the retail fuel oil business conducted by Economy and Federal. B. P. Mackenzie, *98 a division manager for Sinclair, who was deceased at the time of the trial, represented Sinclair in the negotiations. During the course of these negotiations, which consisted of many conferences, Singer and Mackenzie discussed the specific amounts to be paid for each group of tangible assets, including the amounts to be paid for goodwill and for a covenant not to compete. Mackenzie informed Singer that Sinclair would deduct as a business expense the amounts paid for the covenant not to compete, and at a meeting attended by Singer's tax advisor and Jim Patterson, Sinclair's tax manager, the parties discussed the fact that the sale of goodwill would be capital gains to the seller and the amounts received by the seller for a covenant not to compete would be ordinary income. Singer's certified public accountant, William Lax, advised Singer that it was his opinion, based upon respondent's allocation of part of the amount paid by petitioner for the assets of Old Federal and City Coal to goodwill, that the portion of the purchase price actually attributable to the goodwill sold, which he considered substantial, would be taxable at capital gain rates, regardless of the allocation made in *99 the contract. Before a contract was executed, the proposed acquisition was reviewed and passed upon by a succession of officials at various echelons in the management of Sinclair. In a report to Mackenzie dated November 5, 1958, H. R. Barley, Sinclair's district manager for New Jersey who had attended some of the conferences between Singer and Mackenzie, stated that Singer was willing to sell the business for $578,500 for the physical assets plus a payment for a 10-year noncompete agreement equal to four cents per gallon, or approximately $480,000, based on current volumes of twelve million gallons annually. Barley's report, together with Mackenzie's comments, were submitted to Sinclair's budget committee which recommended to Sinclair's executive committee in a report dated January 16, 1959, that Sinclair pay not more than one million dollars, exclusive of inventory, allocated: $500,000 to physical assets; $50,000 to goodwill; and $450,000 to an agreement not to compete, computed on the basis of 3.75 cents per gallon on an estimated volume of twelve million gallons. Sinclair's executive committee approved the purchase on the basis of this report on January 22, 1959, and the purchase *100 was approved by Sinclair's parent corporation, Sinclair Oil Corporation (hereinafter referred to as Sinclair Oil), on this basis on approximately January 30, 1959. Subsequent to final approval of the purchase by Sinclair Oil on the basis of Sinclair's budget committee's recommendation, two changes were made, upon Singer's instigation, in the allocation of the purchase price to basic asset groups. On approximately February 4, 1959, Sinclair agreed to the purchase on the basis of $590,000 for physical assets, $50,000 for goodwill, and $360,000 for a noncompete agreement, computed at 3 cents per gallon on a sales volume of twelve million gallons. The final allocation of $640,000 to physical assets, $50,000 to goodwill, and $310,000 to the covenant not to compete was approved on approximately February 16, 1959. One of Sinclair's representatives showed Singer a copy of the final draft of the agreement prior to the execution date and discussed it with him. On February 27, 1959, petitioner, Economy, Federal, and the Singers entered into an agreement with Sinclair providing, in part, as follows: THIS AGREEMENT, made and entered into this 27th day of February, 1959, by and between FEDERAL *101 OIL COMPANY, a New Jersey corporation, having its principal place of business at 525 Raymond Boulevard, Newark, N.J., ECONOMY SERVICE, INC., a New Jersey corporation, having its principal place of business at 525 Raymond Boulevard, Newark, N.J., FEDERAL ECONOMY CORP., a New Jersey corporation, having its principal place of business at 525 Raymond Boulevard, Newark, N.J., parties of the first part, hereinafter collectively referred to as "Vendors"; MICHAEL SINGER, residing at 101 Central Park West, New York, New York, and SYDEL SINGER, residing at 101 Central Park West, New York, New York, parties of the second part; and SINCLAIR REFINING COMPANY, a Maine corporation authorized to transact business in the State of New Jersey as a foreign corporation, having its principal business office at 600 Fifth Avenue, New York 20, New York, hereinafter called "Sinclair" party of the third part; WITNESSETH: WHEREAS, Vendors are the owners of certain property in the City of Newark, New Jersey, hereinafter more particularly described, which they desire to sell to Sinclair and which Sinclair desires to purchase under the terms and conditions hereinafter set forth: NOW, THEREFORE, in consideration *102 of the mutual promises herein contained the parties hereto agree as follows: 1. Vendors agree to and do hereby sell, convey, assign, transfer and deliver to Sinclair all their right, title and interest in and to the good will and all right, title and interest in and to the names "Economy Service, Inc.", "Federal Economy Corp.", or any combination or variation thereof, including the word "Economy" used in connection with their retail fuel oil and oil burner service business and all their right, title and interest in and to their retail fuel oil and oil burner accounts and contracts. 2. Federal Oil Company agrees to and does hereby sell, convey, assign, transfer and deliver to Sinclair all its right, title and interest in and to the good will of Federal Oil Company as used in the retail fuel oil and oil burner service business and all its right, title and interest in and to its retail fuel oil and oil burner accounts and contracts, in Essex, Union, Hudson and Middlesex Counties, New Jersey. 3. Federal Oil Company agrees to and does hereby sell, convey, assign, transfer and deliver to Sinclair all that certain piece or parcel of land, including all improvements situated thereon, *103 more fully described in Schedule A attached hereto and made a part hereof. * * * 4. Economy Service, Inc., agrees to and does hereby sell, convey, assign, transfer and deliver to Sinclair all its furniture, signs, and trade fixtures on its books on the date hereof but not less than all items set forth in Schedule B, which is attached hereto and made a part hereof. 5. Federal Economy Corp. agrees to and does hereby sell, convey, assign, transfer and deliver to Sinclair all of its motor vehicle equipment, set forth in Schedule C, which is attached hereto and made a part hereof. 6. Economy Service, Inc., agrees to and does hereby sell, convey, assign, transfer and deliver to Sinclair all of its motor vehicle equipment set forth in Schedule D, which is attached hereto and made a part hereof. 7. Economy Service, Inc., agrees to and does hereby sell, convey, assign, transfer and deliver to Sinclair all its storehouse equipment and parts, including oil burners, furnaces, tanks, fittings, etc., to be determined by joint inventory of Economy Service, Inc., and Sinclair prior to the effective date of this Agreement; said inventory to be hereafter attached to this Agreement as Schedule *104 E and to become a part hereof. 8. Economy Service, Inc., agrees to and does hereby sell, convey, assign, transfer and deliver to Sinclair all of its stock of #2 fuel oil and kerosene to be determined by joint inventory of Economy Service, Inc., and Sinclair as of the effective date of this Agreement, said inventory to be hereafter attached to this Agreement as Schedule F and to become a part hereof. * * *
10. Michael Singer and Sydel Singer, parties of the second part, individually and as officers, principal stockholders and employees of Vendors, jointly and severally, hereby covenant and agree with Sinclair that they will not, jointly or severally, at any time during the period of five (5) years from and after the effective date of this transfer, directly or indirectly, under any circumstances or conditions whatsoever, engage in or become interested individually or as a corporation, partnership, directors, officer, clerk, principal, agent, employee, trustee or in any relation or capacity whatever in the retail business, of selling or distributing fuel oil, and selling or distributing fuel oil burners and parts or the servicing of fuel oil burners within the Counties of Essex, *105 Union, Hudson and Middlesex, without the written consent of Sinclair. 11. Federal Oil Company hereby covenants and agrees with Sinclair that it will not at any time during the period of five (5) years from and after the effective date of this transfer, directly or indirectly, under any circumstances or conditions whatsoever, either singly or with any corporation, partnership or individual engage in the retail business, of selling or distributing fuel oil and of selling or distributing fuel oil burners and parts or the servicing of fuel oil burners within the Counties of Essex, Union, Hudson and Middlesex, New Jersey, without the written consent of Sinclair. 12. Economy Service, Inc., and Federal Economy Corp. agree that within ninety (90) days subsequent to the effective date herein provided each shall commence such action and proceedings as may be necessary for their respective legal dissolution or change of name and proceed to effect said dissolution or change of name as promptly as possible and that prior to their respective dissolution or change of name they shall abide by the covenants and obligations of Federal Oil Company set forth in the preceding paragraph. Federal Oil *106 Company hereby grants to Sinclair the right to use its name in connection with the accounts and contracts herein transferred for a period of ten (10) months from and after the effective date of this Agreement. * * *
17. The consideration which Sinclair agrees to pay to Vendors for the transfers herein described and the time when same is payable shall be: (a) To Federal Oil Company for the real property and improvements described in paragraph 3 and Schedule A hereof, the sum of FOUR HUNDRED AND EIGHTY-FIVE THOUSAND and 00/100 ($485,000.00) DOLLARS, payable on the effective date of this Agreement. (b) To Economy Service, Inc., for the furniture, signs and trade fixtures described in paragraph 4 and Schedule B hereof, the sum of EIGHTY-FIVE THOUSAND and 00/100 ($85,000.00) DOLLARS, payable upon the effective date hereof. (c) To Federal Economy Corp. for its motor vehicle equipment described in paragraph 5 and Schedule C hereof, the sum of SIXTY-TWO THOUSAND FIVE HUNDRED and 00/100 ($62,500.00) DOLLARS, payable upon the effective date hereof. (d) To Economy Service, Inc., for its motor vehicle equipment described in paragraph 6 and Schedule D hereof, the sum of SEVEN THOUSAND *107 FIVE HUNDRED and 00/100 ($7,500.00) DOLLARS, payable upon the effective date hereof. (e) To Economy Service, Inc., for its storehouse equipment and parts described in paragraph 7 and Schedule E hereof, the actual value disclosed by the inventories thereof and as set forth in Schedule E, payable upon completion of said inventories and verification of said equipment and parts. (f) To Economy Service, Inc., for its fuel oil and kerosene stocks described in paragraph 8 and Schedule F hereof, the value based on New York harbor barge prices for said products, disclosed by the inventories thereof and as set forth in Schedule F, payable upon completion and verification of said inventories. (g) To Economy Service, Inc., for the good will hereby acquired and all the right, title and interest of Economy Service, Inc., and Federal Economy Corp. in and to their respective names, the use of the name Federal Oil Company in connection with the retail fuel oil business mentioned in paragraph 2 and all right, title and interest in and to all of the retail fuel oil and oil burner service accounts as defined in paragraphs 1 and 2, the sum of FIFTY THOUSAND and 00/100 ($50,000.00) DOLLARS, payable *108 upon the effective date of this Agreement. 18. Sinclair agrees to pay to Federal Oil Company as and in consideration for its agreement to assist in retaining the retail fuel oil and oil burner service accounts and as consideration for its further agreement to refrain from engaging in the fuel oil, oil burner installation and service business as set forth above, the sum of SIXTY TWO THOUSAND and 00/100 ($62,000.00) DOLLARS per annum, commencing on the effective date of this Agreement, and a like amount of SIXTY TWO THOUSAND and 00/100 ($62,000.00) DOLLARS on the first day of March of each of the years 1960, 1961, 1962 and 1963. 19. The consideration for the agreement of second parties as set forth in paragraph 10 shall be the benefit they derive as majority stockholders of Federal Oil Company. The effective date of the transfer was March 1, 1959. On June 30, 1959, Economy and Federal were liquidated under section 332 of the Internal Revenue Code of 1954 and were dissolved pursuant to the requirement of paragraph 12 of the agreement. During the five-year period from February 27, 1959, through February 27, 1964, covered by the agreement, neither petitioner *109 nor the Singers engaged in the retail fuel oil, oil burner installation or service business. Beginning sometime in the summer of 1964, for a period of approximately three months, petitioner engaged in the retail fuel oil business under the management of someone other than Singer and reacquired some of Economy's customers which had been sold to Sinclair. Retail fuel oil customers characteristically do not change suppliers as long as they receive good service, even if ownership changes as long as the transition is gradual. Of the retail accounts acquired by petitioner in 1952 and 1953 from Old Federal and City Coal, respectively, 90-95 percent were retained by petitioner and Economy and were on the books at the time of the sael to Sinclair. Petitioner did not notify these customers that they were being supplied by new proprietary interests. For a period of time after March 1, 1959, Sinclair used the trucks of petitioner and its subsidiaries for the conduct of the acquired retail fuel oil business. Sinclair also used Economy's billing system for a period of time after the closing of the agreement. As a result of the agreement, Sinclair paid to petitioner $62,000 during March of 1959 *110 through 1963. On its returns for 1960 through 1963, petitioner treated the payments as long-term capital gain for the sale of goodwill. In his statutory notice of deficiency dated August 28, 1964, respondent determined that the payments are taxable as ordinary income because made for a covenant not to compete. On its income tax returns for each of the taxable years 1959 through 1963, Sinclair deducted as an expense the $62,000 payment to petitioner, treating it as a payment for the covenant not to compete. Pending the outcome of this case, respondent has tentatively questioned Sinclair's treatment of the payments. The audit of Sinclair's returns for the years in question is presently being held in suspense pending further action. The payments in the amount of $62,000 paid to petitioner in each of the years 1960, 1961 and 1962 by Sinclair were payments for a covenant not to compete. Opinion The sole issue is whether the payments in the amount of $62,000 made by Simclair to petitioner in each of the years 1960, 1961 and 1962 pursuant to the agreement of February 27, 1959, were consideration for petitioner's covenant not to compete, taxable as ordinary income, or payment for goodwill, *111 taxable as capital gain. The agreement of February 27, 1959, whereby petitioner's fuel oil business was sold to Sinclair, specifically sets out a covenant on the part of petitioner not to engage in the fuel oil business for a period of five years without Sinclair's consent and provides a consideration for this covenant in the amount of $62,000 annually over the life of the agreement. Petitioner asks the Court to disregard the written agreement of the parties and find that the $310,000 total consideration assigned to the covenant not to compete was in reality a payment for goodwill. In the alternative, petitioner contends that the amount of $21,000 was paid for the noncompete agreement and that the remainder of the consideration stated therefor was payment for goodwill. It is true that the Court is not bound by the form in which parties to an agreement clothe their transaction but is charged with the duty of determining the realities of the transaction after having considered all the pertinent facts. Carl L. Danielson, 44 T.C. 549, relied upon by petitioner, and cases cited therein. Nonetheless, where the parties have specifically set out a covenant not to compete *112 in an agreement and have assigned a value to the covenant, strong proof is required to prove that the agreement differed in reality from the written expression thereof. Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2), affirming 29 T.C. 129; Hamlin's Trust v. Commissioner, 209 F. 2d 761 (C.A. 10), affirming 19 T.C. 718; Benjamin Levinson, 45 T.C. 380. The burden of so proving lies with the petitioner. Ullman v. Commissioner, supra. In the instant case, the covenant not to compete was a subject of negotiation from the earliest discussions which resulted in the agreement of sale between Sinclair and petitioner, its wholly-owned subsidiaries, and the Singers. Sinclair consistently insisted upon a noncompete agreement and the allocation of a substantial portion of the purchase price to the covenant. During the course of the negotiations Sinclair's tax manager explained to Singer, who represented petitioner in the negotiations, that that portion of the purchase price allocated to the covenant not to compete would be taxable to petitioner as ordinary income. Edward J. Anglin, assistant to the financial vice *113 president of Sinclair's parent corporation, Sinclair Oil, having the duty of reviewing all capital expenditures and making recommendations to the financial vice president, testified that in his opinion Sinclair would not have entered into the agreement if less than $310,000 of the purchase price had been allocated to the covenant. Singer never objected to the inclusion of the noncompete agreement or the allocation of $310,000 of the purchase price to the covenant and signed the agreement on behalf of petitioner after receiving a copy of the final draft of the contract prior to the execution date. Where, as here, the taxpayer enters into an agreement which has been the subject of arm's-length negotiations, freely, willingly and knowingly, we are not inclined to rewrite the agreement into one which the parties themselves would not have transacted. See Benjamin Levinson, supra. The fact that tax considerations admittedly played a part in determining the amount of the purchase price allocated to a covenant not to compete does not contaminate the transaction as long as the covenant was separately bargained for and has some independent basis in fact or arguable relationship *114 with business reality. Schulz v. Commissioner, 294 F. 2d 52 (C.A. 9), affirming 34 T.C. 235; Benjamin Levinson, supra; Carl L. Danielson, supra. In the instant case, petitioner entered the retail fuel oil business in 1952. By 1956 it had acquired the assets of three corporations previously engaged in the retail fuel oil business and in that year transferred its retail business to Economy, its wholly-owned subsidiary, which by 1959 was doing a business of approximately 12 million gallons annually. Singer, who owned 66 2/3 percent of petitioner's stock and directed the business policies of petitioner, Economy, and Federal, was 56 years of age in 1959 and in good health. Singer's acumen as a businessman is well illustrated by the rapidity with which petitioner, and then Economy, developed a substantial fuel oil business. The fact that petitioner could have been a real competitive threat to Sinclair cannot be doubted. In fact, after the five-year term of the covenant, petitioner did engage in the retail fuel oil business, under the management of someone other than Singer, and reacquired some of Economy's customers which had been sold *115 to Sinclair. Petitioner's covenant not to compete which was included in the February 27, 1959, agreement with Sinclair and the consideration payable therefor were the subject of separate negotiations in an arm's-length transaction. Unlike the Danielson case, where a portion of the purchase price was allocated to the noncompete agreement at the last minute without prior notification or discussion, the written agreement in the instant case realistically reflects the negotiations of the parties. This is our only concern where, as here, the noncompete agreement has some arguable relationship with business reality. Cf. Balthrope v. Commissioner, 356 F. 2d 28 (C.A. 5), affirming a Memorandum Opinion of this Court. Respondent's determination that the $62,000 paid by Sinclair to petitioner in each of the years 1960, 1961 and 1962 was payment for petitioner's agreement not to compete and taxable as ordinary income is sustained. Decision will be entered for the respondent.