GRANT T. RUDIE, JR., AND KAREN RUDIE, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 6032–65.    Filed November 29, 1967.

*John R. McDonald*, for the petitioners.
*Gerald P. Moran*, for the respondent.

OPINION

On the first issue, respondent contends that the cost of the prescription file cannot be amortized [3] because the file is a single indivisible

---

[3] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

Sec. 1.167(a)–3, Income Tax Regs., provides, in pertinent part, as follows:

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can

capital asset which is not exhausted by the passage of time or is in the nature of goodwill, or, alternatively, because petitioner has failed to establish a cost of $3,000 or a useful life of 3 years. Petitioner characterizes the file as an intangible asset, useful in his business for only a limited period, and argues that the allocation was at arm's length and the useful life was estimated with reasonable accuracy.

In support of his position that the cost of the prescription file cannot be amortized, respondent draws an analogy to customer and subscription lists. As a general rule, no amortization of such intangible assets has been allowed. *Anchor Cleaning Service, Inc.*, 22 T.C. 1029 (1954) ; *Aaron Michaels*, 12 T.C. 17 (1949) ; *The Danville Press, Inc.*, 1 B.T.A. 1171 (1925). Without question, a prescription file does serve as an inducement for those customers with refillable prescriptions to return to the drugstore which holds the file. In this sense it is in the nature of goodwill. See *Rodney B. Horton*, 13 T.C. 143 (1949). Statistics show, however, that the average prescription will be refilled for only a limited period of time, either because a specific number of refills was designated or because the person will cease to need the drug. At this point the prescription itself has little or no value as an inducement for customers to return. The same thing may be said of the collection of "unrefillable" prescriptions. A pharmacist, then, is in the unique position, as a result of custom in the pharmacy profession, of being unable to solicit business by directly contacting those persons whose names appear in the prescription file. The only acceptable advertising with respect to a prescription file is a general announcement of its acquisition. This basic difference weakens the analogy drawn by respondent between a customer list and a prescription file.

In addition, the peculiar facts in this case do not establish a goodwill element in the prescription file. The file was not purchased to provide a means of contact with Rexall's customers. Petitioner reasonably believed that this would naturally flow from "buying out" his only competitor in an area where it was unlikely that other competition would develop. Accordingly, we think the customer and subscription list cases cited by respondent do not govern the instant case. We conclude, however, that petitioners are not entitled to the claimed depreciation deductions based upon the cost of the prescription file because they have failed to establish a cost or reasonable life of the file.

The Commissioner's notice of deficiency is presumptively correct, and the petitioners have the burden of proving it to be wrong. *Welch v. Helvering*, 290 U.S. 111 (1933). Here the petitioners characterize

be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

the value of the prescription file to them merely as a "convenience" and a "time saver" and assert that the $3,000 allocation agreed to by the parties establishes its "cost." We cannot agree. The only evidence to support the $3,000 allocation was testimony of an insurable interest in a prescription bottling file based upon a value of between $2 and $3.50 per prescription, which represents the cost in time and effort to reconstruct the file. We believe that under these circumstances the insurance value has no substantial relationship to fair market value, but, assuming the contrary to be true, petitioner has failed to show a computation based upon the insurance value which bears any relationship with the $3,000 allocation.

Under these particular circumstances we give little weight to petitioner's unilateral allocation, especially since there were no adverse tax interests to assure a fair allocation. "While the amounts allocated to these intangibles were seemingly in fair proportions, by their nature they resist precise appraisal, and rest on wholly subjective considerations. Estimates and crude approximations of losses are not sufficient." *Golden State Towel and Linen Service, Ltd.* v. *United States*, 373 F. 2d 938 (Ct. Cl. 1967).

Although petitioner had never before participated in a sale or purchase of a prescription file, he contends that his estimate of a 3-year useful life, based upon his own experience and the advice of other pharmacists, was reasonable and sufficient under the statute and regulations. The regulations are clear, however, that "No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life." Sec. 1.167(a)–3, Income Tax Regs.

In support of his opinion, petitioner relies on national averages which show few prescriptions are filled after a 1-year period, with declining numbers thereafter. We attach little significance or probative weight to the evidence of national averages because it is indefinite and inconclusive and because petitioner has failed to establish any relationship between the national averages and the facts of this case. Moreover, the previous effort made by this Court to rely primarily upon statistical data to determine the useful life of an intangible asset met with no success. See *Commissioner* v. *Indiana Broadcasting Corporation*, 350 F. 2d 580 (C.A. 7, 1965), reversing 41 T.C. 793 (1964), certiorari denied 382 U.S. 1027. Nor is the pharmacy industry practice a sufficient indication of the prescription file's probable useful life. Cf. *Coca-Cola Bottling Co.*, 6 B.T.A. 1333 (1927).

The only other evidence in this case indicating a useful life is the stipulated record of refills of prescriptions purchased from Day during the month of December for the years 1962 to 1966. This record does not include refills of new prescriptions written by a physician for the

same drug covered by a still refillable prescription of Rexall. Assuming the record to be accurate and representative, we conclude that it augurs against rather than for a 3-year useful life. In the fourth year after sale the petitioner was refilling more than half as many Rexall prescriptions as he did in the year of sale. In the fifth year the number had dropped to only one-fourth. Under petitioner's theory of the value of the prescription file to him, it is plain that its useful life was greater than 3 years. This record simply does not establish that 3 years was a reasonably accurate estimate of the useful life of the prescription file. Since insufficient evidence was introduced from which we can calculate with "reasonable accuracy" the average useful life of the prescription file or its usual life span, we cannot indulge in surmise and speculation by arbitrarily declaring an average useful life. Consequently, we are constrained to conclude on this record that the petitioner has failed to prove respondent erred in his determination that the prescription file had an indeterminable useful life.

By raising in an amended answer the issue of petitioner's right to a ratable deduction for the cost of the covenant not to compete, an issue not relied upon in determining the deficiency, respondent has assumed the burden of proof. *Sheldon Tauber*, 24 T.C. 179 (1955). We find that respondent has failed to carry that burden.

Respondent contends that there was neither economic reality to the covenant not to compete nor separate bargaining with respect to it so as to establish a distinct value. Alternatively, he argues that the amounts allocated to both the covenant and the prescription file represent the capital cost of the elimination of competition over an unlimited period and are thus nondeductible. Petitioner, on the other hand, emphasizes the separate treatment accorded the covenant in the agreements and the specific allocation of $3,750 agreed to by the parties, and argues that the facts establish its independent significance.

Generally, the purchaser of a covenant not to compete is entitled under section 167 to amortize the price paid for the covenant ratably over the life of the covenant if "severable consideration for it can be shown, and it has some basis in fact or arguable relationship with business reality so that reasonable men might bargain for such an agreement." *Benjamin Levinson*, 45 T.C. 380, 389 (1966). As a result of the specific exclusion of goodwill as a depreciable asset by section 1.167(a)–3, Income Tax Regs., it is clear that there must be "independent significance" to the covenant apart from merely assuring the effective transfer of goodwill. *Ullman* v. *Commissioner*, 264 F. 2d 305, 307 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). The choice is not, however, between "goodwill" on one hand and "covenant not to compete" on the other, for the two most often are interrelated, whether

or not separate significance can be attributed to the covenant. In the case at hand, the facts establish to our satisfaction that the covenant was a principal asset of the purchase, was separately bargained for, and did, indeed, have independent significance.

Day covenanted not to compete with petitioner in each agreement executed by the parties. After his attorney explained the significance of the covenant, petitioner specifically requested its inclusion in the formal buy and sell agreement. A specific allocation of $3,750 was made to the covenant by petitioner and was approved by Day. The fact that the allocation was made subsequent to the sales agreement does not alter its efficacy since the parties recognized a value to the covenant by contract provision, leaving specific allocation to later agreement. In addition, the change of the covenant period from 10 to 5 years was within their contemplation since they understood that Skundberg would reduce the 10-year limit if he thought it would not be legally enforceable. At the closing conference the 5-year period and the $3,750 allocation were approved by both parties. It is true that once a transaction has crystallized the parties may not manipulate tax consequences by "window dressing" in subsequent contracts. *George H. Payne*, 22 T.C. 526 (1954). But here the parties did not reach final agreement until the closing conference.

Respondent insists that the separate bargaining element is missing because of the lack of negotiation or discussion of price. As we stated in *Benjamin Levinson, supra*, "The answer to this is that [the seller] apparently never objected to the price attributed to the covenant by the purchasers—so there was little reason for them to negotiate it." We agree that "the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it." *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761, 765 (C.A. 10, 1954).

The economic condition of the Westby area reveals the real importance of the covenant to petitioner. In view of Wesby's location in a poor market area, it was unlikely that someone would open a new drugstore there when Day left. Thus, with Day's covenant, petitioner was assured a virtual monopoly in the drug business. In this position, petitioner did not need to trade upon the goodwill of Rexall in order to secure new customers. As a matter of fact, petitioner has operated the only drugstore in Westby from 1961 until the present time at a substantial increase in profits. Absent the covenant, Day, who concededly had a good reputation in Westby as a pharmacist, would have been free to relocate there if his enterprise in Lancaster had failed. Thus, there was sufficient "business reality" to induce reasonable men to bargain for such an agreement. In addition, the allocation of

$3,750 to the covenant, or about one-half of the purchase price attributable to the intangible assets, seems reasonable under the circumstances.

Alternatively, respondent characterizes the cost of the covenant as a nondeductible cost of eliminating competition for an indefinite period of time, citing *B. T. Babbitt, Inc.*, 32 B.T.A. 693 (1935). A "cost of eliminating competition" characterization was made in *Babbitt*, but it was determined that the specific covenant period agreed to established a definite useful life over which the capital asset was exhaustible. While the petitioner may enjoy the benefits of the economic situation in Westby originating with the agreement with Day for a much longer period than 5 years, we think the covenant period is a reasonable measure of the life of the asset purchased from Day.

To reflect the conclusions reached herein,

*Decision will be entered under Rule 50.*