EST, AN EDUCATIONAL CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
EST v. Commissioner
Docket Nos. 8043-80, 8998-81.
United States Tax Court
T.C. Memo 1986-527; 1986 Tax Ct. Memo LEXIS 81; 52 T.C.M. (CCH) 920; T.C.M. (RIA) 86527; October 23, 1986. Alan B. Hoffman and W. Bruce Springer for the petitioner. Stephen M. Miller, for the respondent. FEATHERSTON
*82 MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: These consolidated cases were assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7456(d) and Rule 180, et seq. [1] The Court agrees with and adopts the Opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GUSSIS, Special Trial Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the taxable years ended June 30, 1976 and 1977 in the respective amounts of $862,192 and $1,426,547 and also determined an addition to tax under section 6651(a) for the taxable year ended June 30, 1977 in the amount of $356,636.75 The issues are (1) whether petitioner is entitled to amortization deductions in the taxable years ended June 30, 1976 and 1977 with respect to the acquisition of a 10-year license to use the so-called Body of Knowledge, (2) whether petitioner is entitled to deductions *83 for interest expense under section 163 in the taxable years ended June 30, 1976 and 1977 with respect to an obligation incurred in acquiring the 10-year license, (3) whether petitioner is entitled to amortization deductions under section 167 in the taxable years ended June 30, 1976 and 1977 with respect to certain registration lists and graduate lists, (4) whether petitioner is entitled to a deduction in the amount of $800,000 under section 162 in the taxable year ended June 30, 1977 pursuant to a profit-participation agreement with Werner Erhard and (5) whether petitioner is liable for an addition to tax under section 6651(a) for failure to file a timely return for the taxable year ended June 30, 1977. With respect to the wardrobe expense issue, the parties have agreed to be bound by this Court's holding on the wardrobe expense issue in the consolidated cases of Erhard Seminars Training v. Commissioner and Twine, Inc. v. Commissioner, (T.C. Memo. 1986-526, also filed on this date). FINDINGS OF FACT Some of the facts have been stipulated and they are herein incorporated by this reference. Petitioner was on an accrual basis of accounting during the years in issue.Petitioner *84 filed its corporate income tax return for the taxable year beginning July 1, 1976 and ending June 30, 1977 on February 7, 1978 with the Internal Revenue Service at Fresno, California. On August 26, 1975, est, USA was incorporated in the State of Nevada for the purpose of conducting the so-called est standard training [2] which had some years previously been formulated and developed by Werner Erhard (hereinafter Erhard). On November 4, 1975 est, USA changed its name to est, an educational corporation (hereinafter petitioner). Its officers included Donald F. Cox, president, K. Laurel Scheaf, secretary, and Gary P. Grace, treasurer. Petitioner's income tax return for the period ended June 30, 1976 reflected that petitioner had issued 500,000 shares of common stock to Werner Erhard Charitable Settlement, 33/35 Pier Road, St. Helier, Jersey, Channel Islands and that it was wholly owned by Werner Erhard Charitable Settlement (hereinafter Settlement). Petitioner's income tax returns for the taxable years ended June 30, 1977 through 1980 indicated that Settlement continued as the owner of petitioner's common stock. *85 On September 30, 1975, Erhard (by Albert L. Colloms, his attorney) and Alexia Trust Company, Limited (as trustee) entered into a "Settlement" which provided in part as follows: SETTLEMENT THIS SETTLEMENT IS MADE the Thirtieth Day of September in the Year Nineteen Hundred and Seventy-Five, BETWEEN: WERNER ERHARD Settlor of the First Part and: ALEXIA TRUST COMPANY LIMITED a Company incorporated under the Laws of the States of Jersey which has registered offices located in St. Helier, States of Jersey, Channel Islands, WHEREAS, the said party of the First Part is desirous of creating the Trust hereby constituted in order to serve mankind and make the world better; and, WHEREAS, the Trust hereby constituted is intended to be known as the WERNER ERHARD CHARITABLE FOUNDATION. NOW THIS INSTRUMENT WITNESSETH AS FOLLOWS: (1) GIFT AND GRANT
The Settlor hereby gives and grants by way of donation (inter vivos) unto the Trustee the sum of $100US (Dollars One Hundred) to be held (together with all additions which may hereafter be made thereto by the Settlor or any other person or persons) upon the Trust and subject to the powers and provisions hereinafter declared and *86 contained, and the Trustee hereby declares that the Trustee will hold the said sum and all additions and all other money, property and assets hereinafter mentioned upon the Trust and with and subject to the said powers and provisions herein contained. (2) PURPOSES OF THIS TRUST
This Trust is established for the following purposes, namely: (a) The relief of poverty; (b) the advancement of education; (c) the advancement of religion; and/or (d) the advancement of other purposes which are of public benefit being in every case charitable purposes according to the Laws of England and Wales. * * * The est standard training was first presented in 1971. Erhard, who originated the concepts and methods embodied in the est standard training, left his position as an instructor for Mind Dynamics sometime in 1971 to pursue the new concepts. The decision to do so was reached after consultation with his attorney Harry Margolis and members of the law office of Harry Margolis. On October 4, 1971 a resolution was adopted by an entity called Saratoga Restaurant Equipment Co. (Saratoga) to change the name of the corporation to Erhard Seminars Training, Inc. and to install the following *87 officers: Erhard, president, Elaine Cronin, vice-president, and K. Laurel Scheaf, treasurer. On October 4, 1971 Werner Erhard and Presentaciones Musicales, SA (hereinafter Presentaciones Musicales or PMSA) executed an agreement of sale which provided in part as follows: AGREEMENT OF SALE
This Agreement is entered into this Fourth day of October, 1971, by and between WERNER ERHARD, an individual, hereinafter referred to as SELLER and PRESENTACIONES MUSICALES, SA, a Panamanian corporation, hereinafter referred to as BUYER. RECITALS
(1) SELLER has originated certain processes, methods and procedures which stimulate the growth and expansion of human mental powers.Unless properly developed, such mental growth and expansion would, in the normal course of human life, remain dormant; (2) SELLER desires to dispose of his interest in these processes, methods, and procedures; and, (3) BUYER desires to obtain the exclusive rights to all of SELLER's processes, methods, and procedures. NOW, THEREFORE, for valuable consideration and in consideration of the mutual promises of the parties hereto, the the parties agree as follows: (1) SELLER and BUYER acknowledge that this Agreement *88 is being executed simultaneously with an employment contract by and between BUYER and SELLER. A copy of said employment contract is marked Exhibit "A", attached hereto and incorporated by this reference as if fully set forth herein. (2) SELLER hereby assigns, transfers, and sets over to BUYER all of his right, title and interest in and to any and all of the processes, methods and procedures he has originated in the area of mind expansion and mental awareness. Additionally, SELLER assigns all of his right, title and interest in and to any future developments in the above-designated areas so long as he shall be employed by BUYER pursuant to the terms and conditions of the contract attached hereto as Exhibit "A". The lawful termination of either agreement (Exhibit "A" or the agreement herein) shall automatically and simultaneously terminate the other agreement. (3) SELLER and BUYER recognize that many of the processes, methods and procedures are intangible items existing only within the mind of SELLER. SELLER represents that he will reduce said intangible items to writing within a reasonable period of time after the execution of this Agreement. BUYER shall possess all rights *89 incident to ownership in said processes, methods, and procedures including all of those intangible items described above. (4) BUYER agrees to pay SELLER One Million Dollars ($1,000,000.00) for the above-described processes, methods and procedures. Said amount includes a four percent (4%) interest factor and the total amount of principal and interest shall be due and payable on October 4, 1981. (5) SELLER guarantees BUYER that within the Ten (10) year period preceding the above-described payment to SELLER, BUYER shall realize Six Million Dollars ($6,000,000.00) in gross income by and through the proper, prudent, efficient and business-like use and development of the within-described processes, methods and procedures. BUYER represents that it shall use and develop said processes, methods and procedures in a competent business fashion and use all reasonable effort to maximize gross income from their use and development. SELLER and BUYER agree to review, at least annually the direction and policy which BUYER is undertaking in said use and development. BUYER agrees that any significant and/or other than ordinary directional and/or policy change shall be discussed with SELLER at *90 the time of its occurrence in addition to any planned annual meetings. Should BUYER not realize said Six Million Dollars ($6,000,000.00) in gross income in the described Ten (10) year period there shall be pro rata reduction of price due and payable on October 4, 1981. Said amount then due and payable shall be calculated on the following formula: Gross income received in said Ten (10) year period / $6,000,000.00 = X / $1,000,000.00 It is agreed by the parties that this formula shall be used and X shall equal the amount to be paid to SELLER only if gross income realized in said Ten (10) year period does not exceed Six Million Dollars ($6,000,000.00). BUYER and SELLER agree that said formula shall not be used if BUYER's gross income exceeds Six Million Dollars ($6,000,000.00) in said Ten (10) year period. The employment contact referred to in the above agreement of sale provided in part as follows: EMPLOYMENT CONTRACT
This Agreement is entered into in San Francisco, California, on October 4, 1971, by and between WERNER ERHARD, hereinafter referred to as EMPLOYEE and PRESENTACIONES MUSICALES, SA, hereinafter referred to as EMPLOYER. RECITALS
(1) EMPLOYER has simultaneous *91 herewith obtained the exclusive rights to EMPLOYEE's processes, methods and procedures and in addition to that acquisition would like to obtain the personal services of EMPLOYEE; and, (2) EMPLOYEE is seeking a financially satisfactory permanent arrangement which will be coupled with the sale of his processes, methods and procedures. NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows: (1) The parties recognize and acknowledge that this Agreement is being executed simultaneously with an AGREEMENT OF SALE by and between EMPLOYEE and EMPLOYER. Said AGREEMENT is marked Exhibit "A", attached hereto and incorporated by this reference as if fully set forth herein. (2) This Agreement shall be effective as of October 4, 1971, and shall continue until mutually rescinded by the parties hereto or until such other termination occurs under the terms and conditions as set forth herein. (3) EMPLOYER shall pay to EMPLOYEE, as salary, Two Thousand Five Hundred Dollars ($2,500.00) per month for the duration of this Agreement. Said compensation shall be reviewed and discussed annually on each October 4 or on such other date as may be *92 mutually agreed upon by the parties hereto and said amount may be increased or decreased at any such meeting for the ensuing yearly term but shall at no single meeting be increased or decreased more than Five Hundred Dollars ($500.00) per month. Each party agrees to and guarantees a good faith participation in said annual compensation discussions. EMPLOYER may, at its sole discretion, award EMPLOYEE a bonus within the last thirty (30) days of any calendar year. (4) EMPLOYEE shall have a reasonable opportunity to approve all services required of him by EMPLOYER and EMPLOYEE may refuse to perform any services which are not in keeping with his competence, position and personal dignity in the area of mind expansion and growth of mental awareness. EMPLOYEE recognizes that it is in the mutual interest of himself and EMPLOYER that he remain an active public figure in these areas and, therefore he agrees that he will not unreasonably refuse to perform any services called for by the terms of such agreement.Should a dispute arise between the parties concerning the reasonableness of any EMPLOYEE refusal to perform any said services, such dispute shall be subject to binding arbitration. * *93 * * (5) EMPLOYER recognizes the unusual qualities which EMPLOYEE possesses and hereby agrees that he shall be given full credit and recognition for all present processes, procedures, methods and to any further developments for which he may be responsible during a term of this Agreement and EMPLOYER further agrees that any organizations, entities or other groups which are established to promote, produce or otherwise disseminate such creations shall always give due recognition to EMPLOYEE. (6) The compensation to be paid to EMPLOYEE under this Agreement shall not include payment for his services in other than a person-to-person, face-to-face dissemination of the processes, procedures and methods and promotion thereof; and, EMPLOYEE shall receive Ten Percent (10%) of all income from publication, recording, television, motion pictures and any other related dissemination that does not involve a person-to-person, face-to-face presentation. * * * (7) EMPLOYEE agrees that he will perform his services exclusively for EMPLOYER. * * * (2) EMPLOYEE will at all times cooperate fully with EMPLOYER in seeking and obtaining employment opportunities. Should EMPLOYEE become aware of possible *94 employment opportunities, he shall bring them to the prompt attention of EMPLOYER. EMPLOYEE agrees he shall cooperate fully with EMPLOYER and make all attempts to arrange for his employment when such opportunities arise. (23) From and after this date, EMPLOYEE shall not enter into any other agreement of any kind with reference to employment or services described herein without prior notice to EMPLOYER, its successors or assigns, for the duration of this Agreement. If such employment or services are to be undertaken by EMPLOYEE during a time in which he is not under the exclusive control of EMPLOYER, EMPLOYER must give its written consent prior to EMPLOYEE's agreement to engage in such services. However, EMPLOYER agrees it shall not unreasonably withhold its consent, if the terms of the performance of such services are within the provisions of this Agreement. On December 4, 1971 Erhard Seminars Training, Inc. and Presentaciones Musicales executed a license agreement which provided in part as follows: LICENSE AGREEMENT
This Agreement is entered into this 4th day of December, 1971, by and between PRESENTACIONES MUSICALES, SA, a Panamanian Corporation, hereinafter referred *95 to as LICENSOR, and ERHARD SEMINARS TRAINING, INCORPORATED, A California corporation, hereinafter referred to as LICENSEE. RECITALS
(1) LICENSOR has obtained the exclusive rights to certain processes, methods and procedures developed by WERNER ERHARD, hereinafter referred to as ERHARD, as well as the exclusive right to ERHARD's personal services; (2) LICENSOR desires to dispose of a portion of these exclusive rights and services; and, (3) LICENSEE wishes to obtain a Ten (10) year right to be the exclusive United States distributor of the processes, methods and procedures as well as ERHARD's personal presentations thereof. NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is agreed as follows: I LICENSOR hereby grants to LICENSEE an exclusive Ten (10) year license to all and everything LICENSOR possesses pursuant to that certain Agreement of Sale entered into on the Fourth day of October, 1971, by and between ERHARD and LICENSOR. A copy of such agreement is marked Exhibit "A", attached hereto and incorporated by this reference as if fully set forth herein. Said license rights shall be limited to presentations. The term United States *96 shall include the Continental United States, Alaska, Hawaii and any other possessions or territories of the United States of America. II LICENSEE shall pay LICENSOR One Million Two Hundred Thousand Dollars ($1,200,000.00) for such exclusive rights. Said One Million Two Hundred Thousand Dollars ($1,200,000.00) shall be payable within Thirty (30) days of the signing of this Agreement. III LICENSOR guarantees that LICENSEE shall realize at least Five Million Dollars ($5,000,000.00) in income as more specifically described in Paragraph 5 and 6 of Exhibit "A". IV LICENSOR warrants and guarantees to LICENSEE that it possesses good, marketable title to the subject matter being transferred herein.LICENSOR will, at his sole expense, defend any and all attacks on ownership levied by anyone against LICENSEE. V LICENSOR agrees not to compete in any manner or form with LICENSEE in the Continental United States as described herein or in any other area during such time as specific written permission has been granted to LICENSEE to present the processes, methods and procedures which are the subject matter of this Agreement. VI LICENSEE hereby specifically assumes all obligations *97 of LICENSOR to ERHARD as such obligations are contained in an employment contract between LICENSOR and ERHARD. A copy of such contract is market Exhibit "B" and incorporated by this reference as is fully set forth herein. VII It is understood and agreed between the parties hereto that ERHARD by his signature on this Agreement, has given his written consent to the terms of this Agreement and to the transfer of said employment contract (Exhibit "B"). * * * IX LICENSEE shall have the option to extend this Agreement for Five (5) additional years provided that One (1) year's written notice be given to LICENSOR. Within Thirty (30) days of the exercise of the option, LICENSEE shall pay to LICENSOR an additional Six Hundred Thousand Dollars ($600,000.00) * * * On December 14, 1971 the board of directors of Erhard Seminars Training, Inc., authorized Erhard (as chairman of the board) and K. Laurel Scheaf (as president) to borrow $1,000,000 from International Aesthetics, Limited, a Nevada corporation (IAL). Under date of December 14, 1971 Erhard, on behalf of Erhard Seminars Training, Inc., executed two separate notes in favor of IAL, each in the amount of $1,000,000. One of *98 the notes required payment 10 years after date while the other note provided for payment one year after date. Both notes provided for interest at the annual rate of 10 percent. On November 20, 1972 Erhard Seminars Training, Inc. issued Certificate No. 1 for 20,000 shares of its stock to IAL. Said certificate was assigned to California Aesthetics, Ltd. by IAL on February 28, 1974. On November 23, 1976 California Aesthetics, Ltd. assigned the 20,000 shares of stock in Erhard Seminars Training, Inc. to PMSA. Beginning in January 1972 audiotapes were made of the est standard training, the graduate review seminar and other presentations and seminars conducted during this period. In November 1973 a black and white videotape recording was made of an entire 60-hour training session conducted by Erhard for use in training additional trainers. In August 1975 a second videotape recording was made, in color, of another standard training session conducted by Erhard, again for use in training additional trainers. In June 1976 a videotape recording was made of a graduate review seminar. Erhard Seminars Training, Inc. realized gross income from the est standard training and related activities *99 in the amounts of $250,162 for the taxable year ended April 30, 1972; $1,133,062 for the taxable year ended April 30, 1973; $2,012,127 for the taxable year ended April 30, 1974; $4,761,308 for the taxable year ended April 30, 1975; and $3,478,276 for the taxable year ended April 30, 1976. A "Termination Agreement," effective as of September 1, 1975, was executed by Erhard and Presentaciones Musicales and provided in part as follows: TERMINATION AGREEMENT
This Agreement is entered into by and between WERNER ERHARD, a married man, as an individual, hereinafter referred to as "ERHARD", and PRESENTACIONES MUSICALES, S.A., a Panamanian corporation, hereinafter referred to as "PMSA", effective as of September 1, 1975. WITNESSETH:
WHEREAS, the parties entered into an Agreement of Sale and Employment Contract on 4 October 1971, and WHEREAS, the principal item of importance in the Agreement of Sale was the right to material developed by ERHARD, hereinafter referred to as the "Body of Knowledge", and WHEREAS, control of the Body of Knowledge was transferred by ERHARD to PMSA, and WHEREAS, the parties at the outset of their relationship were not aware of the potential *100 value of the Body of Knowledge in human terms, and WHEREAS, the parties have always been in agreement that the most fundamental and ultimate purpose of their relationship was to make it possible for the Body of Knowledge to be made available to people everywhere in the most positive way, and WHEREAS, ERHARD concluded in 1974 that the future availability, development and growth of the Body of Knowledge in a responsible fashion to serve all of humanity required a basic change in the relationships established 4 October 1971, and WHEREAS, ERHARD advised PMSA of the general program that ERHARD had determined was appropriate for the Body of Knowledge, and WHEREAS, PMSA agreed and now agrees that its particular structure and form could inhibit to some degree the availability of the Body of Knowledge as a meaningful contribution to mankind and so delay the possible transformation of social institutions and individuals. THEREFORE, the parties are in alignment and agree to go forward as follows: 1. The Agreements between the parties of 4 October 1971 are hereby terminated effective 26 August 1975 on the basis of and under the conditions set forth in this Agreement. The parties *101 intend such termination to be responsible and supportive and there is no question as between them of any or anything being wrong in their initial relationship and its operation to date. ERHARD specifically acknowledges the contribution that PMSA has made to the dissemination of the Body of Knowledge. 2. The employment arrangements under which the services of ERHARD were made available to PMSA for a period of years led to the direct employment of ERHARD by Erhard Seminars Training, a California corporation. Such arrangements are terminated effective 1 September 1975.Erhard Seminars Training, hereinafter referred to as Twine, will execute a copy of this Agreement to confirm its acquiescence in the termination of its employment relationship with ERHARD. 3. The circumstances existing on October 4 of 1971 have changed dramatically. The parties then contemplated a relatively small and slowly growing educational program. Neither party anticipated the manner in which the Body of Knowledge would explode in terms of public acceptance. It is now clear that the responsible dissemination of the Body of Knowledge as rapidly as possible everywhere must take priority over any other purposes *102 to be served. ERHARD has moved forward to make it possible for the Body of Knowledge to be controlled for the United States of America by an educational trust located in the British Commonwealth and for the rest of the world by an educational foundation established in Switzerland. 4. PMSA has reacquired all of the rights to the Body of Knowledge which it had at any time. It has disposed of such rights effective 1 September 1975 to Welbehagen B.V. PMSA warrants it has or will have responsibly compensated all those individuals or entities which have had, directly, or indirectly, an interest in the Body of Knowledge prior to 1 September 1975. ERHARD has no respnsibility for such compensation. 5. In the disposition of its rights with reference to the Body of Knowledge, PMSA acknowledges the continuous development of the Body of Knowledge and intends to include all of the Body of Knowledge as it is developed to date in the transfer to Welbehagen. 6. ERHARD accepts full responsibility for the future of the Body of Knowledge. This includes future growth, responsibility for scientific research and legal design and structure. ERHARD shall hold PMSA harmless in all respects with *103 reference thereto. 7.The parties intend that PMSA, directly and in a representative capacity, shall be fully and fairly compensated for the services it has rendered to ERHARD and the Body of Knowledge. PMSA has accepted as reasonable a proposal from Welbehagen, B.V. for final disposition by PMSA of its rights to the Body of Knowledge. PMSA has agreed that any difficulty as to compensation will be submitted to arbitration in London and application will be made to an appropriate London Court if there are any procedural problems. 8. ERHARD accepts ultimate responsibility for the continued integrity of the Body of Knowledge. PMSA has provided in its disposition of its rights to the Body of Knowledge for protection of the views of ERHARD with reference to the Body of Knowledge for the indefinite future. 9. For clarity and for no other purpose, the parties now refer to the Agreement of Sale and the Employment Contract, both of 4 October 1971, and specifically note as follows: a. ERHARD, as the source of the Body of Knowledge, was and continues to be indispensable to its presentation and development. For the present, the comfortable responsible availability of ERHARD together *104 with the Body of Knowledge is essential if this Agreement and its purpose is to be meaningful. ERHARD has therefore advised PMSA and the various entities having any relationship within the Body of Knowledge as a result hereof that ERHARD will continue on a reasonable basis to accompany and be part of the Body of Knowledge for the indefinite future. To that end, ERHARD has negotiated with est, U.S.A., an Employment Agreement making the services of ERHARD available to carry out the puroses intended by the parties. b. PMSA has made no payment to ERHARD under the Agreement of Sale. All requirements for any such payment are cancelled effective with the execution of this Agreement. c. The guarantees made by ERHARD to PMSA in the Agreement of Sale have not been realized. The parties acted responsibly at all times and neither was at any time in the wrong. There was no default or neglect by ERHARD at any time. There is little doubt but what the guarantees would have achieved over the total period of the Agreement of Sale. The guarantees of ERHARD are cancelled effective with the execution of this Agreement. d. ERHARD acknowledges having been fully compensated in all respects under *105 the PMSA Employment Contract. ERHARD does not now nor will he at any time in the future seek compensation or damages from PMSA or any other entity or individual related to PMSA for any compensation arising under the Employment Contract. Included shall be all claims which Erhard may have, whether or not he has knowledge of them as of this date, with reference to medical reimbursement, automobile expenses or costs, private office provisions, or other business expenses included or beyond Paragraphs 8, 9, 10, 11 or 12 of the Employment Contract of 4 October 1971. This acknowledgment shall extend to Twine as the prior employer. * * * 11. PMSA acknowledges that the Standard Training was properly copyrighted with the full consent of PMSA in the name of WERNER ERHARD on 16 January 1976 in the United States Copyright Office. ERHARD has the full permission of PMSA and the right to extend such claims throughout the world. PMSA does not now and will not at any future date make any claim of ownership or participation in the Body of Knowledge or the est Standard Training based upon any Agreements, oral or written, between ERHARD and PMSA or between PMSA and any other entity. 12. The parties *106 acknowledge that it may be desirable to modify or waive one or more of the provisions of this Agreement and the general understandings of the parties in order to carry out their agreed purposes. No such action shall be effective unless set forth in writing signed by the parties and clearly setting forth the consequences of such action. The parties intend to cooperate fully as to any documentation that may require execution at any time, as to any litigation or any other action that may be required at any time and generally to support the purposes of this Agreement. A "Purchase Agreement," effective as of September 1, 1975, was executed by Presentaciones Musicales and Welbehagen International, B.V., a Netherlands Corporation (hereinafter Welbehagen) and provided in part as follows: PURCHASE AGREEMENT
This Agreement is entered into by and between PRESENTACIONES MUSICALES, S.A., a Panamanian corporation, hereinafter referred to as "PMSA", and WELBEHAGEN INTERNATIONAL, B.V., a Netherlands corporation, hereinafter referred to as WELBEHAGEN, to be effective September 1, 1975. WITNESSETH:
WHEREAS, PMSA has certain rights in and to the est Body of Knowledge developed by *107 Werner Erhard, and, WHEREAS, PMSA has certain continuing rights to developments with reference to the est Body of Knowledge, whether by Werner Erhard or others, including literary and other copyrights, trade names and trademarks, and the like, and, WHEREAS, PMSA by contract is entitled to control and designate the manner in which the services of Werner Erhard were to be performed, and, WHEREAS, Werner Erhard and PMSA have reached agreement as to the appropriate future development and delivery of the est Body of Knowledge, and, WHEREAS, Werner Erhard and PMSA have made arrangements under which PMSA must dispose of its rights to the est Body of Knowledge to a party acceptable to Werner Erhard, and, WHEREAS, WELBEHAGEN is prepared to acquire from PMSA the rights to the est Body of Knowledge under terms and conditions that are mutually acceptable to the parties. * * * Based upon the foregoing premises, the parties agree as follows: 1. The parties define the est Body of Knowledge as consisting of anything and everything developed by Werner Erhard as carried forward and communicated by Erhard Seminars Training, Inc., a California corporation, from October of 1971 to and *108 including August 31, 1975. This shall include all copyrighted material, trademarks and trade names and any and all material related thereto. Generally and not specifically, the est Body of Knowledge is made up in form and substance of the est Standard Training, Graduate Seminars, Guest Seminars, communication and other workshops, and numerous special events, presentations and lectures. The est Body of Knowledge is an educational program involving and consisting of material designed to permit individuals to experience life and living more fully. It is indebted to many thought systems and is a totally new way of looking at reality. The est Body of Knowledge is best identified in the recorded record of the activities of Werner Erhard and his associates from 1971 through August 31, 1975. References to est are intended to be references to the est Body of Knowledge from this point forward. 2. est is growing and developing. It is the intent of the parties that such growth and development shall become the property of WELBEHAGEN hereunder. * * * 5. PMSA hereby assigns, sets over and sells to WELBEHAGEN all of PSMA's right, title and interest in and to est. The parties recognize *109 that the value of est must at all times be considered speculative. To this date, the exploitation of est in an economic sense has been largely limited to the United States of America.All economic data with respect to such activities of Erhard Seminars Training, Inc., have been made available to WELBEHAGEN and are warranted by PMSA to be true and correct in all respects. 6. The purchase price for all of the assets conveyed hereunder by PMSA to WELBEHAGEN is fifteen million dollars ($15,000,000) (U.S.). Said sum shall be payable by WELBEHAGEN to PMSA in installations of no less than one million dollars ($1,000,000) (U.S.), per year. Each annual installment shall consist of interest at the rate of nine percent (9%) on such sum as shall represent the principal value of licenses disposed of or directly operated by WELBEHAGEN from time to time. No interest shall be paid on any sum in excess of such principal value. WELBEHAGEN may prepay all principal at any time at its own convenience and without the consent of PMSA. So much of any payment as shall not be required for interest shall be attributed to principal. The total interest actually due shall be the minimum payment to be made *110 by WELBEHAGEN to PMSA for the first four years under this agreement. Commencing with the fifth year, WELBEHAGEN must pay to PMSA at least one million dollars ($1,000,000 U.S.) a year on account of principal while keeping all interest current. 7. The sole security for the performance required of WELBEHAGEN in terms of payments to PMSA hereunder shall be est. PMSA shall be limited to recovering from WELBEHAGEN sums actually accrued and due and unpaid up to any moment at which PMSA reclaim est. 8. The parties do contemplate the immediate licensing by WELBEHAGEN of rights for the United States of America at a price which should permit WELBEHAGEN to function under this agreement economically. PMSA acknowledges that it will be impossible for WELBEHAGEN to make payments beyond those provided for and in the manner provided for until and unless additional territorial licensing or sale by WELBEHAGEN take place for geographical areas other than the United States of America. * * * A "Licensing Agreement," effective September 1, 1975, was executed by petitioner and Welbehagen and provided in part as follows: LICENSING AGREEMENT
This Agreement is entered into by and between *111 WELBEHAGEN INTERNATIONAL, B.V., a Netherlands corporation, hereinafter referred to as "WELBEHAGEN", and est, an educational corporation, a Nevada corporation, hereinafter referred to as "est", to be effective September 1, 1975. WITNESSETH:
1. REPRESENTATIONS
The parties contract with reference to the following facts and in reliance upon the following representations: a. WELBEHAGEN represents and warrants that: 1. It is a corporation validly existing under Netherlands law. 2. It is acting within its scope of authority in executing this License. 3. The office of Fursprecher Wolfgang von Erlach in Zurich, Switzerland, has undertaken the establishment of a public tax-exempt foundation to be know as "The Werner Erhard Foundation for est". It is the purpose of said Foundation to engage in educational charitable activities arising out of the est Body of Knowledge. Welbehagen will in due course be owned by a Swiss corporation which will be donated to two Foundations. 4. It has the exclusive right to grant the License which is the subject of this Agreement, limited only as set forth herein. 5. It is contracting herein to carry out the express purposes of Werner *112 Erhard in that it will at all times proceed from responsibility for the broadest possible communication of the Body of Knowledge, as defined below. 6. Its address is Bleulandweg 450, Gouda, the Netherlands. b. est represents and warrants that: 1. It is a corporation validly existing under Nevada Law. 2. It has full power and authority to enter into this Agreement. 3. It is solely owned by an educational charitable trust created by Werner Erhard in Jersey, Channel Islands. 4. It is contracting herein to carry out the express purposes of Werner Erhard in that it will at all times proceed from responsibility for the broadest possible communication of the Body of Knowledge, as defined below. 5. It has contractual control of the exclusive services of Werner Erhard and recognizes that such services are critical to Welbehagen and the fundamental realization of the purposes of all persons and entities concerned with the est Body of Knowledge. 6. Its address is 765 California Street, San Francisco, California, 94108, U.S.A.
2. DEFINITIONS
As used herein, the parties define the following words and phrases: a. "Body of Knowledge" includes all of the est material *113 of which Werner Erhard is the source. Such material is reflected in all of the activities of Erhard Seminars Training, a California corporation, which controlled est material from 1971 to August 31, 1975. The Body of Knowledge involves educational materials and methods. These are directed toward the recognition and realization of the ability of each individual to understand his or her experience, to develop a degree of consciousness that will permit better communication and make more meaningful life and living for each individual. The Body of Knowledge further includes ongoing study and research, written and oral, into the development of processes, lectures, trainings, workshops, and/or seminars. * * * 3. TERM
The Term of this License is for a period of ten (10) years, beginning September 1, 1975, and ending August 31, 1985. 4. OPINION TO EXTEND TERM
est shall have the right to extend the term of this License for a further period of five (5) years beyond the expiration of the Term hereon on a first refusal basis. est shall deliver to Welbehagen in writing on or before September 1, 1984, notice that est intends to exercise this option.If the parties cannot agree *114 on the terms for the extension, the arbitration provisions provided for below shall be utilized. 5. AGREEMENT
WELBEHAGEN, for the considerations stated herein, coveys to est an exclusive license to the Body of Knowledge for the U.S.
6. CONSIDERATION
est, in consideration for the License: a. Pay WELBEHAGEN Ten Million Dollars ($10,000,000.00) (U.S. funds), on or before August 31, 1985. Any unpaid balance shall bear interest at the rate of ten percent (10%) per annum. est may pay WELBEHAGEN interest only for a period not to exceed three (3) years. Thereafter est shall pay WELBEHAGEN no less than One Million Dollars ($1,000,000.00) (U.S. funds) each year on account of principal, while keeping interest current for each year thereafter, with the full balance of principal and interest being due on the last of the term. est shall have the right to prepay any or all of the amount due at any time during the life of this Agreement. b. The Body of Knowledge, specifically including all new material developed during the life of this license, shall at all times be the property of WELBEHAGEN, est's interest therein shall be that of a license only. c. est shall make Werner *115 Erhard available to WELBEHAGEN at any and all times, provided only that all costs (salary, travel, etc.) shall be paid by WELBEHAGEN and that such availability is reasonable under this agreement. WELBEHAGEN must make its own independent arrangements with Werner Erhard. d. est shall not engage in any activities covered by this license outside of the U.S. without the prior written approval of WELBEHAGEN. This limitation shall be considered an express covenant not to compete running for the life of this license and for three years thereafter. e. est shall at all reasonable times confirm publicly the rights of WELBEHAGEN. WELBEHAGEN may request such confirmation and dictate the form thereof, provided WELBEHAGEN shall bear all expenses in connection therewith. 7. PRESENTATION OF THE BODY OF KNOWLEDGE
est shall at all times support, protect and present the Body of Knowledge in a manner consonant with the standards characterizing its presentation to the public to date. est shall at all times meet the current standards as established for the Standard Training, Graduate Seminars, Guest Seminars, Workshops and Special Events. est shall not modify the present program in any *116 substantial detail without the prior written approval of WELBEHAGEN. An "Employment Agreement" effective as of September 1, 1975, was executed by petitioner and Erhard and provided in part as follows: EMPLOYMENT AGREEMENT
This agreement is entered into at San Francisco, California, by and between WERNER ERHARD, hereinafter referred to as Employee, and est, an educational corporation, a Nevada corporation, hereinafter referred to as Employer. WITNESSETH:
WHEREAS, Employee is the source of the est Standard Training and the Body of Knowledge related thereto, both of which will hereinafter be referred to as est, and WHEREAS, Employee has been employed by a California corporation known as Erhard Seminars Training which made est available to the general public, and WHEREAS, Employee's relationship with Erhard Seminars Training and the relationship of Erhard Seminars Training with reference to est both came to an end as of August 31, 1975, and WHEREAS, Employer has acquired all rights for the United States to est, effective September 1, 1975, and WHEREAS, Employer has required a long term financially satisfactory arrangement covering their Employer-Employee status. *117 NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is hereby agreed: 1. The basic elements of this agreement have been concluded between the parties for some time and the parties intend that this agreement shall be effective in all respects beginning September 1, 1975 and shall continue within its terms indefinitely. 2. Employer acknowledges that Employee is indispensable for the carrying out of the Employer's educational activities with reference to est. Employer further acknowledges that all employees of Employer are important to Employer's activities. An increasing number of such employees are developing skills and relationships which substantially enhance their importance to the educational activities of the Employer with reference to est. 3. The parties acknowledge that Erhard Seminars Training, Inc. provided additional compensation to its employees through a bonus program. The parties hereto agree that such policy should not be continued and should be brought to an end with the calendar year 1975 or as soon as possible thereafter. In lieu thereof, and in planning for the responsible growth of Employer, Employer will provide a profit *118 participation sum to Employee and employees. For the employees, Employer shall compute on a calendar year basis the sum equal to ten percent (10%) of the gross income of Employer, hereinafter referred to as maximum profit participation sum. Such sum so determined shall be utilized by Employer for the benefit of the employees of est as set forth below. No part of such sum shall be set aside except to the extent that Employer shall show an excess of gross income over gross expense (ignoring the 10% provision) hereinafter referred to as net profit, during such calendar period. The parties recognize that in any calendar year in which there is no net profit, there will be no profit participation sum. In any calendar year when the profit participation sum for employees and the profit participation sum for Employee, as set forth in number 5 below, exceeds the net profit, est will make pro rata payment of the net profit. (By way of example, if in year 6, est has gross income equal to ten million dollars then the possible profit participation sum for employees would be one million dollars and the possible profit participation sum for Employee would be five hundred thousand dollars. If *119 in that same year est had gross expenses equal to nine million dollars, then est would provide employees with two-thirds of the one million dollars of profit and Employee with one-third of one million dollars.) * * * 4. Employee's monthly compensation shall be no less than Four Thousand Dollars ($4,000.00) and shall rise on an annual basis over a period of ten (10) years to a maximum of Eight Thousand Dollars ($8,000.00) per month. Such compensation shall be payable in any event. 5. The profit participation sum, defined in number 3 above, will be paid to Employee as deferred compensation. Employer shall pay to Employee ten percent (10%) of the gross revenues received by Employer during each calendar year for a period of five (5) years, after which such compensation shall be reduced to five percent (5%) of such gross revenue for five (5) years, after which such compensation shall be reduced to two (2) percent of gross revenues for the remaining effective life of this agreement. The applicable portions of number 3 above are incorporated herein with reference to Employee. * * * Any and all sums accumulated for Employee under this paragraph shall be deferred for a period *120 of five (5) years from the date on which such participation was earned. The sum so accumulated shall then be paid out on a pro rata monthly basis over a period of one hundred (100) months at one percent (1%) per month until the total sum is paid. In the event of Employee's death or any other termination of this agreement, the five year accumulation period shall be waived. Additionally, in the event of such death or termination, the parties or their legal representatives, may by mutual agreement agree to a lump sum payment. A "Modification of Employment Agreement," dated June 30, 1977, was executed by petitioner and Werner Erhard and provided in part as follows: MODIFICATION OF EMPLOYMENT AGREEMENT
The parties to this Agreement are est, an educational corporation, a Nevada corporation, hereinafter referred to as Corporation, and WERNER ERHARD, hereinafter referred to as WE. WITNESSETH: Whereas, WE is an employee of Corporation, and Whereas, the parties entered into an employment agreement effective September 1, 1975, which is still in full force and effect, and Whereas, the parties have for many months negotiated with reference to a modification of said employment *121 agreement, and Whereas, the parties now desire to modify said employment agreement. Now, therefore, in consideration of the mutual promises of the parties hereto, it is hereby agreed: 1.) The existing employment agreement is to remain effective in all respects except as follows: a. The provisions with reference to any additional or special compensation based upon the gross income of Corporation as provided in Paragraph 5 of the September 1 agreement, are of no further force and effect. Accordingly, there shall be no deduction of any kind against WE's basic salary from this point forward. b. The provisions in Paragraph 3 of the September 1 agreement with respect to a Profit Participation sum are hereby cancelled. c. Corporation will provide a five percent (5%) compensation bonus for all employees for the fiscal year ending June 30, 1977. * * * f. Corporation shall undertake a qualified profit sharing plan for all employees of Corporation based upon the maximum deduction provided for under current law. Such plan shall be non-discriminatory. Corporation shall consult with WE from time to time with reference to such plan and shall give careful and full consideration *122 to his views in that regard provided only that WE undertakes to make no recommendations which would favor his own position over that of any other employee. g. Corporation shall expand employee benefits in the areas of health, education, insurance and other areas that nurture the well-being of the employee and the employee's family. Corporation will discuss such proposals with WE and, within reasonable economic limits, will undertake to adopt the views of WE provided only that no program shall be undertaken which shall discriminate in favor of WE. * * * An undated "Agreement For Profit Participation" was executed by petitioner and Erhard and provided in part as follows: AGREEMENT FOR PROFIT PARTICIPATION
The parties to this Agreement are est, an educational corporation, a Nevada corporation, hereinafter referred to as Corporation, and WERNER ERHARD, an Independent Contractor, hereinafter referred to as WE. WITNESSETH: Whereas, the activities of WE with reference of the Body of Knowledge known as est determine in large part the economic success of Corporation, and Whereas, the parties recognize that economic benefits to WE have been inadequate to date and the parties *123 desire to correct such situation, and Whereas, the parties desire to assure for Corporation independent contractual activity of WE. Now, therefore, in consideration of mutual promises of the parties hereto, it is hereby agreed: * * * 2.) Effective July 1, 1976, WE shall receive a profit participation (hereinafter referred to as Participation) from Corporation. Participation shall be determined as of the end of each Corporation fiscal year beginning with June 30, 1977. Participation is to be determined by a computation beginning with the gross income of Corporation. From such gross income there shall be subtracted all expenses of Corporation, as determined to be deductible for federal income tax purposes, with the balance remaining to have subtracted therefrom One Hundred Thousand Dollars ($100,000.00) and the remainder to be due and payable to WE hereunder. Participation shall further be limited to as not to exceed Eight Hundred Thousand Dollars ($800,000.00) in the first year, Six Hundred Thousand Dollars ($600,000.00) in the second year, Four Hundred Thousand Dollars ($400,000.00) in the third year, Two Hundred Thousand Dollars ($200,000.00) in the fourth year and shall *124 cease in all respects with the end of the fifth year. 3.) Participation as provided for herein shall be independent of any other economic relationship as between the parties. Corporation acknowledges that WE has additional contractual relationships of many kinds which require and provide for activities of WE as an independent contractor. Corporation shall not interfere with or participate in the economic consequences to WE of any such other and independent activities. The parties will from time to time discuss the relevance of any such activities to this agreement. 4.) This agreement is intended to be and shall be interpreted as involving WE as an independent contractor. Erhard executed the following "Exclusive License" under date of February 1976: EXCLUSIVE LICENSE
I, Werner Erhard, being the owner of the rights in and to the Body of Knowledge known as Erhard Seminars Training, including, but not limited to the standard training, do hereby confirm the transfer of all of my rights for the period commencing September 1, 1975, through August 31, 1985, to est, an educational corporation. I include the copyright rights and the common law rights owned by me. I intend *125 this document to constitute an exclusive license for the United States of America. I expressly reserve all rights for all other parts of the world. I acknowledge that the consideration for this exclusive license is my employment agreement with est, an educational corporation. I further acknowledge that I undertook to make this exclusive license under an independent agreement with Presentaciones Musicales S.A. I further confirm that Presentaciones Musicales S.A. undertook to see to it that all rights held by it were acquired by est, an educational corporation. I will defend all rights granted hereunder and warrant that I have the right to enter into this exclusive license. In a letter to Don Cox, president of est, an educational corporation, dated April 16, 1976 Erhard made the following representations: It is my understanding that you wish to have for your record a letter indicating my position with reference to the enforcement of any licensing rights est, an educational corporation, has with reference to the Body of Knowledge as to which I hold the federal copyright. est, an educational corporation, is acknowledged by me to be the exclusive licensee for the United States *126 of America of all rights to the material copyrighted by me on January 16, 1976. You shall have the right to take any action with regard to infringements or violations of your license or of the copyright in the same manner as I would have were I acting alone as the sole owner. You may proceed to enforce your rights at any time with or without naming me as a party.I agree to execute any and all documents that may be required to protect your exclusive license. On October 1, 1976 Erhard established the Werner Erhard Foundation for est (hereinafter the Foundation) with a domicile in Zurich, Switzerland with an initial donation of SFr. 60,000. The stated purpose of the Foundation was "to sponsor continuing study and research into educational methods focusing on consciousness and communication in the process of learning, knowing, and on philosophies of life and living, in particular in the sense of e.s.t. (Erhard Seminars Training)." The first "Activity report" of the Foundation's Board of Trustees stated in part as follows: 2. During the first fiscal year the Foundation received the following contributions: a) 5 registered shares, class A of WEF e.s.t. Holding AG, Zurich, with *127 a par value of SFr. 10,000. -- each. The donation of these shares, which gave the Foundation a capital majority but not a voting majority in WEF e.s.t. Holding AG, was linked with the condition, that the Foundation does not actively participate in the management of WEF e.s.t. Holding AF. WEF e.s.t. Holding AG is the parent company of the Dutch company Welbehagen International B.V., which owns and licenses the copyrights relating to the e.s.t. - programs developed by Mr. Werner Erhard. The participation did not generate any return during the first fiscal year of the Foundation for which reason it was entered in the balance sheet at a value of SFr. 1. --. As far as the Board of Trustees is informed by the management of Welbehagen International B.V., it may be anticipated, however, that the profits generated by Welbehagen International B.V. will in the near future flow through WEF e.s.t.Holding AG to the Foundation. By letter dated August 30, 1976 Erhard authorized one Mr. von Erlach in Zurich "to proceed with reference to the Holding Company [WEF e.s.t.Holding AG] by incorporation by a memeber of your office acting as trustee for me, with the express understanding that the *128 shares of the Holding company would then be offered as a gift to the Foundation. The Holding Company was formed and its first report for the year ended December 31, 1977 (executed by Mr. von Erlach as sole director) showed a loss which was explained by the fact that the company had no income yet from its investments. The minutes of the annual stockholders meeting of petitioner on August 16, 1976 state that said annual meeting was held "at the municipal office of the sole shareholder, ALEXIA TRUST COMPANY, LIMITED, at 1008-A Shui Hing House, 23 Nathan Road, Kowloon, Hong Kong." The minutes were signed by one Peter Wang as president of Alexia Trust Company, Limited. The minutes of the annual shareholders meeting of petitioner held on August 15, 1978 state that said annual meeting was held "at Mecklenburglaan 40, 3062 BK Rotterdam, Holland, the principal office of ALEXIA TRUST COMPANY, LIMITED, acting as trustee for the WERNER ERHARD CHARITABLE SETTLEMENT, the sole shareholder of the corporation." The minutes were signed by everd B. van Walsum as president of Alexia Trust Company, Limited. Everd B. van Walsum was also the managing director of Welbehagen during the period here involved. *129 During the taxable years here involved, the est standard training generally consisted of a total of 60 hours comprised of four 15-hour sessions held on two consecutive weekends with groups of 200 to 250 individuals. During this period the est standard training was presented in approximately 26 cities in the United States and was also presented in Canada, the United Kingdom and India. The tuition was $300, with a $50 enrollment fee paid at the time of registration. After the initial presentation of the est standard training in 1971, other forms of training were developed and offered to the public for compensation during the year here involved, including communications workshops, the relationships program and graduate review seminars. Generally, seminars consist of 10 sessions, each lasting three hours and 15 minutes, conducted over a four-month period and geared to a particular subject which has been previously discussed in broader terms in the course of the est standard training. At the outset, only Erhard conducted the est standard training but gradually over a period of years additional stainers were recruited to conduct the est standard training sessions. Erhard made all decisions *130 with respect to the selection of new trainers. The following materials were copyrighted in the name of Erhard: Title
Date
1. est Standard Training and Lecture
1/15/76
(including mind-training processes)
2. Assistant's Training
10/29/73
3. Communication Workshop Diagrams
7/18/77
4. Living on the Threshold of Experience
3/4/76
5. What is the Purpose of est Training
10/28/76
6. If God Had Meant Man To Fly, He Would
12/29/73
Have Given Him Wings (Aphorisms)
7. Certainty
date unavailable
The following materials were copyrighted in petitioner's name (dates unavailable): 1. A Look at est in Education 2. I Used to be Different, Now I'm the Same 3. Lecture on the Completion System Petitioner realized gross income in the taxable years ended June 30, 1976 through 1981 in the following amounts: Taxable year ended
Gross Income
6/30/76
$9,877,054
6/30/77
12,328,199
6/30/78
15,711,561
6/30/79
21,028,855
6/30/80
23,368,328
6/30/81
21,405,119
Petitioner's income tax return for the period from September 1, 1975 through June 30, 1976 showed total income of approximately $7,353,940 and total deductions of approximately *131 $7,362,450. Petitioner's income tax return for the taxable period ended June 30, 1977 showed total income of $9,502,772 and total deductions of approximately $9,390,860. Petitioner's income tax returns for the taxable years ended June 30, 1978 through 1981 showed the following amounts of total income and total deductions: Taxable year ended
Total income
Total Deductions
6/30/78
$11,536,138
$11,536,138
6/30/79
15,416,014
15,416,014
6/30/80
17,801,901
17,801,901
6/30/81
17,868,083
17,868,083
Petitioner made payments denominated as interest to Welbehagen in May 1976 and February 1977 in the respective amounts of $750,000 and $666,666. From February 1977 through September 1978 petitioner made monthly payments to Welbehagen of $83,333 denominated as interest.In September 1978 petitioner made a payment to Welbehagen of $250,000 denominated as principal and, from October 1978 through January 1979, petitioner made monthly payments denominated as interest of $81,250 to Welbehagen. In January 1979 petitioner made another payment denominated as principal in the amount of $250,000 to Welbehagen. In February and March 1979 petitioner made monthly payments *132 of $79,167 denominated as interest to Welbehagen. Petitioner's records reflect a capital contribution to petitioner from Settlement in the week of May 1-7, 1976 in the amount of $600,000 and an additional capital contribution of $150,000 from Settlement in the week of May 8-14, 1976. Petitioner's records also reflect an additional capital contribution of $500,000 from Settlement in the taxable year ended June 30, 1978 and a further capital contribution of $500,000 from Settlement in July 1978. Petitioner's records also show the following: (1) an account receivable due from Welbehagen in the amount of $141,000 as of January 1978; (2) a payment of $56,051.91 from Welbehagen on September 14, 1977; and (3) a series of payments from Welbehagen from April through December 1978 in the total amount of $230,319. During the years it was in operation, Erhard Seminars Training, Inc. maintained a graduate list of all individuals who had taken the est standard training. Monthly mailings were made to individuals on the graduate list. In addition, the individuals on the graduate list were contacted for participation in seminars and specialized workshops. As of August 31, 1975 the graduate list *133 maintained by Erhard Seminars Training, Inc. contained the names of 51,347 graduates. As of August 31, 1975 Erhard Seminars Training, Inc. also listed the names of 11,829 individuals who had registered to participate in the est standard training. Beginning in September 1975, petitioner continued to add new names to the graduate list which it obtained from Erhard Seminars Training, Inc. Petitioner would remove names from the graduate list when requested to do so by the individuals involved. In 1983 the graduate list was still being maintained and it contained some 400,000 names. Werner Erhard and Associates was formed in February 1981. On July 1, 1981 Welbehagen sold the Body of Knowledge to Erhard doing business as Werner Erhard and Associates for $1,385,000. On the same date petitioner executed a Body of Knowledge Bill of Sale and Quit Claim to Separate Property which transferred to Erhard during business as Werner Erhard and Associates for a stated consideration of $150,000 all right, title and interest in the Body of Knowledge and assigned to Werner Erhard and Associates all rights to certain other separate property including the six-day training, the seven-day training, the *134 est assistants program, courses on well-being, consulting relationships and programs offered on audio cassettes. At the same time Werner Erhard and Associates acquired, inter alia, the leases to 32 parcels of real property which constituted the est training center, personal property located in such centers, the Franklin House in San Francisco, California, computer hardware and software and certain graduate records. After its incorporation in 1975 petitioner continued the business activities previously conducted by Erhard Seminars Training, Inc., i.e., the presentation of the est standard training, seminars and workshops, with essentially the same employees and the same training centers. Erhard was a dominant individual in the presentation of the est standard training and the related activities of Erhard Seminars Training, Inc. and continued his dominant role when petitioner undertook these business operations in 1975. In 1981 Werner Erhard and Associates continued the business activities previously conducted by petitioner with essentially the same operating assets and the same employees. OPINION 1. Amortization of License Agreement
Petitioner claimed amortization deductions *135 on its returns for the taxable years ended June 30, 1976 and 1977 with respect to a license agreement (effective as of September 1, 1975) under which petitioner acquired from Welbehagen, a Netherlands corporation, the right to use the so-called Body of Knowledge for a period of 10 years. Under the agreement, petitioner was obligated to pay Welbehagen $10,000,000 on or before August 31, 1985, with interest on the unpaid balance at the annual rate of 10 percent. Petitioner contends that it is entitled to amortize the $10,000,000 purchase price of the license over a period of 10 years. It is well established that the economic substance of a transaction, rather than its form, must control for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935); Zmuda v. Commissioner,731 F.2d 1417 (9th Cir. 1984), affg. 79 T.C. 714 (1982).Where the sole purpose of a transaction is to obtain a tax deduction, it will not be given effect for tax purposes. Knetsch v. United States,364 U.S. 361 (1960). In Falsetti v. Commissioner,85 T.C. 332, 347 (1985), *136 we defined a "'sham in substance' as the expedient of drawing up papers to characterize transactions contrary to economic realities and which have no economic significance beyond tax benefits." It is incumbent upon us to determine whether the parties have in fact done what the form of their arrangements purports to do. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). The transactions in prior years involving an earlier scenario of a purported sale and licensing of the Body of Knowledge are illuminating. In 1971, when Erhard decided to present his original concepts through the est standard training, the processes, methods and procedures developed by him were almost immediately "sold" to a Panamanian corporation for $1,000,000 and shortly thereafter a 10-year "license" was acquired by Erhard Seminars Training, Inc. from the Panamanian Corporation for $1,200,000 for the United States rights to these same processes, methods and procedures as well as exclusive rights to the services of Erhard. The sales price of $1,000,000 for the Body of Knowledge was never paid to Erhard. In 1975 Erhard Seminars Training, Inc. ceased its presentation of the *137 est standard training and the related seminars and workshops. In a series of transactions on or about September 1, 1975 the following events occurred: (1) the 1971 agreement of sale and the employment agreement between Erhard and the Panamanian corporation were terminated; (2) est, an educational corporation, was formed; (3) the Panamanian corporation (Presentaciones Musicales) "sold" the Body of Knowledge to Welbehagen, a Netherlands corporation, for $15,000,000; (4) petitioner obtained a 10-year "license" of the Body of Knowledge from Welbehagen for $10,000,000 payable on or before August 31, 1985; and (5) Erhard entered into an employment agreement with petitioner in recognition of the fact that Werner Erhard was indispensable in carrying out the activities with respect to the Body of Knowledge. Petitioner then continued to present the est standard training, the seminars and the various workshops much as before, with essentially the same employees and the same operating training facilities, except that now petitioner was operating under a new "license" which generated the greatly augmented amortization deductions and interest deductions which are here in issue. There is no *138 perceptible business purpose or economic justification for this parade of transactions. An air of unreality surrounds these events. There is no plausible explanation for the gratuitous surrender by Erhard Seminars Training, Inc. of its license of the Body of Knowledge before the 10-year term was over in view of the growing commercial success of the presentation of the Body of Knowledge and then to unabatedly continue the same operation in new corporate garb. The explanations for this panoply of new entities offered in the record, i.e., that a new organizational structure was needed "to make the work available" and that some image-making purpose would ostensibly be served by placing the ultimate ownership of the Body of Knowledge in the hands of "charitable interests," simply ring hollow. [3]
*139 The paucity of information displayed by the central figures in the creation and successful development of the Body of Knowledge about these foreign entities to whom this valuable asset had ostensibly been entrusted is inexplicable. The fact that the "sale" in 1975 of the Body of Knowledge by its "owner," Presentaciones Musicales, required the acquiescence of Erhard and the execution by Erhard of an "Exclusive License" to petitioner in February 1976 in which he described himself as the "owner of the Body of Knowledge known as Erhard Seminars Training, including, but not limited to the standard training," even though in September 1975 the Body of Knowledge had already been licensed by its "owner" Welbehagen to the petitioner for $10,000,000, create further doubts about the bona fides of the September 1975 "sale" and "license" of the Body of Knowledge. It also appears that the original "sale" in 1971 of the Body of Knowledge by Erhard to Presentaciones Musicales was accompanied by a simultaneous employment agreement between Erhard and Presentaciones Musicales, with the express provision that the termination of either agreement would automatically cancel the other agreement. Since *140 the record shows that in September 1975 Erhard terminated his employment with Presentaciones Musicales it follows that Presentaciones Musicales no longer owned the Body of Knowledge and, consequently, any attempt by it to "sell" the Body of Knowledge to Welbehagen would be a meaningless gesture. Finally, the record shows that on July 1, 1981 Werner doing business as Werner Erhard Associates "purchased" the Body of Knowledge from Welbehagen for $1,385,000, less than six years after Welbehagen had "purchased" the Body of Knowledge from Presentaciones Musicale for $15,000,000, and on the same date petitioner conveyed its interest in the Body of Knowledge to Erhard doing business as Werner Erhard and Associates for $150,000. Such unexplained price disparities for the Body of Knowledge further reflect the economic unreality of the transactions here involved. In Estate of Helliwell v. Commissioner,77 T.C. 964, 983 (1981) we stated that while the structure of the arrangements may reflect exceptional ingenuity and imagination, "we must not be beguiled by such ingenuity -- we must pursue the 'paper chase' to ferret out the substance of the arrangements to determine the *141 proper tax treatment." We have, accordingly, considered the facts and circumstances surrounding the purported purchase in 1975 of a license for use of the Body of Knowledge by petitioner from Wlebehagen for $10,000,000 and we conclude that the transaction was completely devoid of economic reality and hence may be disregarded for tax purposes. [4] In our view, it was simply part of an orchestrated attempt to engender the ever-burgeoning amortization and interest expense deductions through ingenious, but wholly artificial, paper transactions. We therefore hold that petitioner is not entitled to amortization deductions in the taxable years ended June 30, 1976 and 1977 with respect to the purported indebtedness incurred in acquiring the 10-year license from Welbehagen.
*142 2. Interest on Alleged Indebtedness for Welbehagen License
Petitioner claimed interest expense deductions in the taxable years ended June 30, 1976 and 1977 with respect to the purported indebtedness incurred in acquiring the 10-year license from Welbehagen. Section 163 allows as a deduction all interest paid or incurred on an indebtedness. It is well settled that the indebtedness referred to in section 163 must be genuine, and that economic realities govern over the form in which a transaction is cast. Knetsch v. United States,364 U.S. 361 (1960). Under the September 1, 1975 "Licensing Agreement" between petitioner and Welbehagen, the petitioner was purportedly obligated to pay 10 percent interest on any unpaid balance of the $10,000,000 obligation supposedly incurred for the 10-year license of the Body of Knowledge. Our conclusion above that the "License Agreement" was devoid of economic reality and hence may be disregarded for tax purposes is dispositive of this issue. Absent a genuine indebtedness to Welbehagen, the amounts designated by petitioner as interest *143 paid to Welbehagen do not qualify for their deduction under section 163. The mere fact that appropriate book entries were made by petitioner is not controlling. Glasgow Village Development Corp. v. Commissioner,36 T.C. 69 (1961). Although petitioner made payments to Welbehagen during the period here, the record reveals a circular movement of funds between the entities here involved which buttresses our conclusion that the arrangement was not a substantive transaction for tax purposes. Petitioner made payments designated as interest to Welbehagen in May 1976 in the amount of $750,000 and, at the same time, petitioner's records reflect a capital contribution of $750,000 in May 1976 from Settlement, the Channel Islands entity which was formed with a donation of $100 on September 30, 1975 by Werner Erhard as "Settlor." No effort was made by petitioner to explain the source of these funds purportedly contributed by Settlement. The record also reflects a continuing pattern during the years 1975-1979 of payments made by petitioner to Welbehagen and payments to petitioner either in the form of capital contributions from Settlement or direct payments from Welbehagen. *144 The available records show payments by petitioner to Welbehagen designated as both interest and principal totaling some $4,000,000 during this period with a total of some $3,000,000 returning to petitioner either as capital contributions or in the form of direct payments. On this record, we conclude that no genuine indebtedness existed between petitioner and Welbehagen and, consequently, petitioner is not entitled to a deduction under section 163 in the taxable years ending June 30, 1976 and 1977 for the payments to Welbehagen. 3. Amortization of Cost of Registration and Graduation Lists
Petitioner claimed amortization deductions in the taxable years ending June 30, 1976 and 1977 with respect to certain registration and graduate lists which it acquired from Twine, Inc.[5] Petitioner contends that it acquired from Twine, Inc. a registration list containing the names of 11,829 individuals who (as of August 31, 1975) had enrolled for future est standard training. Petitioner valued this list at $35 per individual (or a total of $414,015) which amount consisted of two elements: (1) $25, representing the value of a registered candidate for the training and (2) $10, representing *145 the value of a potential graduate of the training. Petitioner amortized the $25 portion over a 12-month period and amortized the $10 portion over a 10-year period. Petitioner also contends that it acquired a graduate list of 51,347 individuals from Twine, Inc. and that the value of said list was $10 per individual, or a total of $513,470, which it amortized over a 10-year period. Petitioner has the burden of proving both the purported value of the registration list and the graduate list and the limited usefulness of such assets. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a); see Rudie v. Commissioner,49 T.C. 131 (1967). There is no persuasive evidence in the record to support the total valuation of $927,485 assigned to the registration list and the graduate list. Gary Grace, a former financial officer with Erhard Seminars Training, Inc. and later with the petitioner, was unable to provide any meaningful explanation for the values placed upon any lists. He frankly admitted he was "not sure" of any usefulness the registration *146 list would have for petitioner. We do not know the factors or considerations that went into the valuation of these lists. A letter dated March 10, 1976 from Harry Margolis, as president of Twine, Inc., to petitioner, which stated that it "intended to document the agreement entered into between Twine, Inc. and est, an educational corporation on August 31, 1975," merely recited that the negotiated value for the graduate list was $10 per individual and that the negotiated value for the registration list was $35 per individual. These recitals are simply insufficient to support the valuation which petitioner claimed as a basis for its amortization deductions. We give little weight to these recitals. Nor does not record contain any evidence whatever to support a 10-year amortization period for the names contained on the graduate list or the $10 amount allocated to the names on the registration lists. In fact, the record shows that the graduate list continued to grow and that in 1983, when Erhard doing business as Werner Erhard and Associates was presenting the est standard and the related activities, the graduate list had grown to some 400,000 names. Under such circumstances, the *147 graduate list can hardly be categorized as an asset exhausted by the passage of time. In short, we have nothing more than unsupported opinions, to which we give little credence, in the record to show that the assets in question had limited useful lives. [6]
Moreover, an asset of this type generally constitutes goodwill, i.e., the expectancy of continued patronage to the taxpayer who acquires the asset. Cf. Boe v. Commissioner,307 F.2d 339 (9th Cir. 1962). Goodwill is not a depreciable asset. Section 1.167(a)-3, Income Tax Regs. *148 Even if the asset acquired by the taxpayer has a demonstrably separate and limited useful life in the taxpayer's business, a separate allocation may be made to such asset only if sufficient facts are presented to permit such an allocation. See Manhatten Co. of Virginia, Inc. v. Commissioner,50 T.C. 78 (1968). Petitioner has failed to present any such evidence.On this record, therefore, we hold that petitioner is not entitled to amortization deductions in the taxable years ending June 30, 1976 and 1977 with respect to the registration lists and the graduate lists it acquired from Twine, Inc.
4. Profit Participation Plan with Erhard
Petitioner claimed a deduction under section 162(a) in the taxable year ending June 30, 1977 in the amount of $800,000 accrued by petitioner under a purported profit participation plan entered into by petitioner with Erhard. Respondent disallowed the deduction.Petitioner has the burden of proof on this issues. Rule 142(a). An undated "Agreement for Profit Participation" was executed, effective July 1, 1976, between petitioner and Erhard who is described therein as an independent contractor. [7] The amount of the profit participation *149 was limited to $800,000 in the first year, $600,000 in the second year, $400,000 in the third year, $200,000 in the fourth year and would cease at the end of the fifth year. There is no persuasive evidence in the record to establish that the profit participation agreement was a bona fide, enforceable obligation that would support a deduction under section 162(a). Again we have a paper trail without any credible evidence to establish that the substance of the purported agreements comported with their form.The testimony of Gary Grace, who was a financial officer of petitioner until May 1979, was extremely vague with respect to the circumstances surrounding the employment agreements, and the profit participation agreements.For the most part, his testimony was conclusory in nature and, apart from stating broadly that the compensation arrangements were "viable" and the the profit participation program was *150 "equitable," he displayed little familiarity with the circumstances surrounding the negotiation of the agreements in question or their economic justification for the petitioner. Mr. Grace testified that the amount purportedly due under the profit participation agreement on June 30, 1977 was accrued by petitioner as an expense and that in the first half of 1978 he was advised by Erhard that he had assigned his right under the profit participation agreement to an entity (not otherwise described) called Associated Advisors. Erhard also testified that he did not receive the payments (10 percent of petitioner's gross revenues for a period of five years) required under an earlier profit participation plan. [8] Moreover, Erhard was extremely vague about the circumstances surrounding any payments under the July 1, 1976 "Agreement for Profit Participation." Finally, Erhard was unable to provide any meaningful information with regard to the details of the negotiations surrounding these agreements. *151 We have carefully considered the record and we conclude that the profit participation arrangements were not bona fide agreements with economic reality. The purported obligations under the agreements were illusory and, in our view, were never intended by the parties to be enforceable and binding. In the absence of a valid profit participation plan, we must hold that petitioner is not entitled to a deduction of $800,000 in the taxable year ending June 30, 1977 for its purported obligation to Werner Erhard. 5. Additions to Tax
Respondent determined that petitioner was liable for the addition to tax under section 6651(a) for the taxable year ending June 30, 1977. Section 6651(a) imposes an addition to tax for failure to file a timely return, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Petitioners filed an untimely corporate income tax return for the year ending June 30, 1977 with the Internal Revenue Service at Fresno, California on February 7, 1978. No timely request was made for an extension of time for filing the return. Petitioner's *152 legal counsel notified the Internal Revenue Service by letter dated October 28, 1977 (which letter is attached to the untimely return) that the requisite extension application was inadvertently misplaced and apparently not filed. A taxpayer may show reasonable cause under the statute by showing that he exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time. See section 301.6651-1(c)(1), Proced. & Admin. Regs. Petitioner does not address this issue on brief.In any event, it is clear that the failure to make a timely filing of a tax return is generally not excused by the taxpayer's reliance on an agent, e.g., his attorney, and such reliance does not constitute "reasonable cause" within the meaning of section 6651(a). United States v. Boyle,469 U.S.    , 105 S. Ct. 687 (1985). We hold, therefore, that petitioner is liable for the addition to tax under section 6651(a) for the taxable year ending June 30 1977. *153 Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure, as amended, unless otherwise noted.↩
2. The nature and purpose of the est standard training are described in the Articles of Incorporation of est, USA in the following terms: The purpose of the est training is to transform the ability of individuals to experience living so that the situations they have been trying to change or have been putting up with clear up just in the process of life itself. est is exclusively educational and expressly disclaims any purpose relating to any specific discipline, therapy, philosophy or theology. est makes available to the public a variety of educational programs based upon the training methods developed by Werner Erhard. These programs include training, seminars, courses, lectures, workshops and similar activities. The educational purposes are constantly being reevaluated, expanded and improved. Quality control of the educational purposes is constant. The educational activities of est are designed to allow members of the public to examine their epistemological assumptions and to develop and discover for themselves their own personal philosophies of life.The educational intent is to create the opportunity for the individual to experience enhanced satisfaction in daily life. est is not designed to make anyone better. est starts from the point of accepting individuals as being perfect as they are. est seeks through education to permit individuals to be the way they are and to get out of being stuck acting the way they were. est training is intended to enable individuals to be more conscious and appropriate by substituting their direct experience for their belief systems and automatic behavior patterns. During the est training, an individual experiences and looks at in an expanded state of consciousness and without judgment, what is actually so with regard to specific areas in his or her life and the individual's fixed or unconscious attitude about those areas. The est training is about aliveness, satisfaction, fulfillment and the experience of completion. The training does not change what one knows; it transforms the way in which one knows. It affects an individual's life in the way it would be affected when there was an essential shift in the individual's experience of living from the attempt to become satisfied with the experience of being satisfied.↩
3. The resulting structure that purportedly accomplished these goals was as follows: The Body of Knowledge was sold to Welbehagen, a Netherlands corporation, which was owned by a Swiss charity (Foundation) through a Swiss holding company (Holding). The stock of petitioner itself was owned by a Channel Islands entity (the Werner Erhard Charitable Settlement). The Alexia Trust Company, Ltd., which was designated to serve as trustee for the Channel Islands entity, appeared to be a corporate entity under the laws of the States of Jersey, Channel Islands, with its principal office in 1976 located in Hong Kong and then, in 1978, in the Netherlands.↩
4. Petitioner introduced in evidence the testimony of Albert Joseph Moore, a senior financial appraiser with Marshall and Stevens, Inc. to establish that the fair market value of the license for the Body of Knowledge as of September 1, 1975 was between $7,000,000 and $10,000,000. Mr. Moore also testified that, in his opinion, it would be reasonable for a prudent businessman, in the exercise of sound business judgment, to enter into a license agreement for the est educational methods and materials for $10,000,000 payable over a 10-year period with interest of 10 percent on any unpaid balance. However, in view of our conclusion that the "License Agreement" lacked economic reality and may be disregarded for tax purposes, such valuation evidence is immaterial. Moreover, Mr. Moore's valuation failed to consider certain factors which, as he admitted, would affect his conclusions. For example, apart from assuming that the various transactions had substance, he did not know that under the 1971 sales agreement and employment agreement between Erhard and Presentaciones Musicales, the termination of Erhard's employment in 1975 would cause title in the Body of Knowledge to revert to Erhard, which would make any subsequent "sale" of the Body of Knowledge to Welbehagen and the ensuing "licensing" of the Body of Knowledge to petitioner nothing more than meaningless gestures.↩
5. It is stipulated that on Jan. 2, 1976 Erhard Seminars Training, Inc. formally changed its name to Twine, Inc.↩
6. With respect to the registration list the petitioner, as we have noted, placed a value of $25 on each candidate registered for the training. The individuals on this list were applicants for the est standard training who had made deposits toward the ultimate fee and were simply waiting for the next available training session which apparently would occur within months. Under these facts it is difficult to perceive a logical rationale for regarding this list as an asset exhausted over an ascertainable period.↩
7. The earlier Sept. 1, 1975 "Employment Agreement" executed by petitioner and Erhard as an employee↩ of petitioner provided that Erhard's monthly salary would be no less than $4,000 and would rise on an annual basis over a period of 10 years to a maximum of $8,000 per month.
8. This earlier profit participation arrangement was included in the Sept. 1, 1975 "Employment Agreement" and provided for payment by petitioner to Erhard of 10 percent of petitioner's gross revenues for a period of five years, reduced to 5 percent of petitioner's gross revenues for the next five years and 2 percent of petitioner's gross revenues for the remaining life of the agreement. It appears that the original profit participation agreement was revoked by a "Modification of Employment Agreement" dated June 30, 1977.↩